# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| **ARCHITECTURAL BUSSTRUT** | § | |
| **CORPORATION d/b/a busSTRUT** | § | |
| | § | |
| **Plaintiff,** | § | Case No. 0:19-cv-00968-DSD-ECW |
| | § | |
| **v.** | § | Judge David S. Doty |
| | § | |
| **TARGET CORPORATION** | § | Magistrate Judge Cowan Wright |
| | § | |
| **Defendant.** | § | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

Plaintiff Architectural busSTRUT Corporation ("Plaintiff" or "busSTRUT"), by and through its undersigned counsel, files the following First Amended Complaint against Defendant Target Corporation ("Defendant" or "Target") (collectively, the "Parties") and hereby alleges as follows:

## INTRODUCTION

1.      BusSTRUT, a small family-owned business, brings this suit against Target for fraudulently inducing busSTRUT to enter an exclusive supplier contract at reduced pricing terms favorable to Target, under which Target never had an intention to perform.  Under this contract, busSTRUT agreed to supply all of a particular type of good which Target might need during a three-year period at specific pricing and, in exchange, Target agreed to obtain all such goods exclusively from busSTRUT.  Target not only failed to uphold its end of the bargain, but has admitted under oath that its offer to make busSTRUT its exclusive supplier for three years in exchange for lower pricing was a mere ██████████ that it never had any intention of actually

1

honoring.  Target has caused busSTRUT millions of dollars in damages and gained millions of dollars in goods and services from busSTRUT without proper compensation.

2.     BusSTRUT is a lighting business that supplies a proprietary, superior, and environmentally conscious track lighting system to national retailers. The system is uniquely capable of supporting the weight of heavy light fixtures (known as "general" light fixtures) and heavy architectural décor such as wood beams, while being mounted at 10-foot intervals.  It also includes smaller, affixed accent lights.   BusSTRUT's system is generally referred to within the industry and among purchasers as Heavy Duty/Structural Track, Track Lighting, Busway, and/or Lighting Materials (hereinafter, the "System" or "Heavy Duty Track").[1]

3.     Because Heavy Duty Track is capable of mounting points longer than 4-foot intervals, it can also be suspended from building structure below ceiling systems. This has architectural and aesthetic benefits, and provides installation cost savings.

4.     BusSTRUT's business model specifically addresses the needs of large, national retailers because Heavy Duty Track is most often used by those retailers.  Due to their large number of stores with substantial square footage, these retailers have a distinct need for track lighting and light fixtures.  For example, Heavy Duty Track enables retailers to "highlight" (and thus encourage foot traffic to) areas inside their retail stores that have strategic importance, such as those with higher margins (e.g., produce areas).

---

[1] Generally, a track lighting system is "heavy duty" — as opposed to "light duty" — if it is capable of supporting significant weight and/or can be mounted at greater than 4-foot intervals.  Light duty track is flimsier and less sturdy than Heavy Duty Track.  However, generally, light duty track is less expensive from a materials standpoint.  Heavy Duty Track is used by retailers to hang accent lights, general lights, and décor because it is sturdier than light duty track and can be mounted/supported at greater intervals, among other reasons.

5.     BusSTRUT often engages in an arduous and expensive marketing and outreach process to obtain national retailer clients, which allows for a steady pipeline of repeat business through new stores and remodels.

6.     Despite the benefits of Heavy Duty Track, before doing business with busSTRUT, Target had never used Heavy Duty Track on a large scale in its stores.  But, beginning in 2015, Target engaged in extensive discussions with busSTRUT about the possibility of using busSTRUT's Heavy Duty Track exclusively in its stores.

7.     These discussions resulted in a November 19, 2015 agreement in which busSTRUT agreed to fulfill Target's Heavy Duty Track needs for new stores and remodels from November 19, 2015 to December 31, 2016.  This initial agreement was, in essence, a "pilot" program for Target to assess a potentially larger, national rollout of Heavy Duty Track in all Target stores beginning in 2017, which would be part of Target's $7 billion plan to remodel essentially all of its stores over the following years.  During this "pilot" period, BusSTRUT fulfilled all of Target's requirements for approximately 50 Target stores to the full satisfaction of both Parties, and it went exceptionally well.  busSTRUT met all of Target's requirements for Heavy Duty Track at the specified pricing under the agreement.

8.     As a result, in late 2016, Target specifically requested that busSTRUT bid on a request for a "heavy duty" lighting track proposal that would extend the initial arrangement for two more years as part of its national rollout.

9.     After months of negotiations, including an in-person meeting between busSTRUT and key Target executives in Minneapolis, busSTRUT and Target entered into an agreement providing that busSTRUT would be the exclusive supplier of Target's Heavy Duty Track requirements for new stores and remodels from November 11, 2016 to December 31, 2019.  During

negotiations, Target specifically told busSTRUT that if busSTRUT would agree to a further reduction in its prices, Target would "stop the competitive sourcing event for the [H]eavy [D]uty [T]rack lighting program" and that busSTRUT would "secure [that] contract" for an additional year (through 2019). And in response to busSTRUT's concerns about having sufficient lead time to meet and fulfill Target's orders, Target promised to provide busSTRUT twelve-weeks lead time on orders. Given the importance of this additional year of exclusivity to busSTRUT, and Target's lead-time promise, busSTRUT agreed to lower its pricing to Target.

10. But as discovery has revealed, despite its representations and promises, Target never intended to honor this agreement. Instead, as Target's primary negotiator and corporate representative Doyle Trankel ("Trankel") has admitted under oath, Target's offer to extend the term of its exclusive supplier relationship with busSTRUT by an additional year in exchange for a reduction in prices was a cynical ███████████████████████ Specifically, Target purposely engaged in a negotiation strategy to cause busSTRUT to believe that ██████████ ███████████████████████████████████████████ ████████████████████ Unfortunately, as Trankel also flatly admitted, Target secured this price reduction without any intention of remaining exclusive to busSTRUT for the additional year under the contract (or any year, for that matter). The same goes for Target's promise of twelve-weeks lead time. Discovery has also revealed that Target knew it was impossible for it to provide busSTRUT that amount lead time; and Target knew so at the time it signed the agreement promising otherwise.

11. Unaware of Target's ██████ busSTRUT proceeded to expend substantial resources to guide Target on effectively configuring Heavy Duty Track in Target stores for the next three years. And given Target's large, national presence and substantial expansion and remodeling

efforts — particularly in the latter half of 2018 and 2019 — busSTRUT saw its future relationship with Target as bright and profitable. Relying on Target's representations and agreement, busSTRUT invested millions of dollars to hire employees, purchase part tooling, and secure materials to fulfill Target's upcoming needs.

12.     Through early 2018, the Parties performed under their contract as agreed. busSTRUT exclusively fulfilled Target's Heavy Duty Track requirements for hundreds of new stores and remodels. BusSTRUT believed that it was Target's exclusive supplier of Heavy Duty Track for Target's new stores and remodels through April 2018. And, in actuality, no other supplier provided Target with Heavy Duty Track for its new stores and remodels through most of 2017.[2] As a result, between 2016 and April 2018, busSTRUT's sales to Target exceeded $14 million. In April 2018, however, Target unilaterally and unexpectedly announced that because of a "design change" it would no longer use busSTRUT in "Pfresh" Target stores. Instead, Target sourced its requirements for those stores through a separate supplier. Weeks later, in May 2018, Target announced it also would no longer use busSTRUT as a supplier for any "Super Target" stores. Target then sourced these additional requirements through a separate supplier.

13.     BusSTRUT files this suit against Target for damages resulting from Target's now-admitted fraud and willful breaches of the Parties' agreement.

14.     BusSTRUT also seeks its costs and attorneys' fees for having to bring this action.

## PARTIES

15.     Plaintiff busSTRUT is a corporation organized and existing under the laws of the State of Delaware. Its principal place of business is in Worthington, Ohio.

---

[2] Upon information and belief, Target began "testing" a competing Heavy Duty Track system in late 2017 in a small number of Target remodels. busSTRUT was neither informed nor had knowledge of Target's testing activities at the time.

16.     Defendant Target is a corporation organized and existing under the laws of the State of Minnesota, with its principal place of business at 1000 Nicollet Mall, Minneapolis, MN 55403.

## JURISDICTION & VENUE

17.     This Court has subject-matter jurisdiction over this lawsuit pursuant to 28 U.S.C. 1332(a) because the Parties are citizens of different States and the amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000.

18.     This Court has personal jurisdiction over Target because Target has, individually and/or in concert with others, (a) transacted business in Minnesota, (b) offered to and contracted to supply goods or services in Minnesota; and/or (c) caused harm or tortious injury in Minnesota.

19.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) in that a substantial part of the events and omissions giving rise to busSTRUT's claims occurred and/or continue to occur in this District.

## FACTUAL BACKGROUND

**A.      Target Intends to Spend Seven Billion Dollars Remodeling its Stores Through 2020.**

20.     Target is one of the largest retailers in the United States, operating over 1,800 stores throughout the United States. It ranks as number 39 on the 2018 Fortune 500 list of the largest United States corporations by total revenue.

21.     Target's stores take various forms, including "Pfresh" and "Super Target" stores. "Pfresh" stores are a "standard" Target store in terms of size and offering.  "Super Target" stores are typically larger, with an expanded selection of grocery and other items.

22.     In an effort to grow its sales and attract customers, Target has undertaken a rapid and highly publicized effort to remodel virtually all of its stores.  On November 14, 2017, Target stated that by 2020 it intended to "reimagine more than 1,000 of our stores, part of our $7+ billion investment to become an even better, more modern Target for our guests."  As Target Senior Vice

President, Justin Burns, recently announced, Target will spend between $4 and $10 million per store in renovation costs.

23.      In early 2018, Target doubled-down on its plan, touting that it had "been moving quickly on our plans to reimagine hundreds of our stores with elements from our next generation of store design, making shopping easier and more inspiring for guests."  Target went on to state "[t]hat work is speeding up in 2018 with nearly triple the number of remodels" and that it intended to "reimagine more than 1,000 stores across the country by the end of 2020."

24.      In short, from 2017 to 2019, Target either has remodeled or will remodel a substantial portion of its 1,800 stores, with an increasing number of remodels occurring in late 2018 and 2019.

**B.      BusSTRUT is a Family-Owned Lighting Business.**

25.      Founded in 2004, busSTRUT is a family-owned lighting business with numerous national customers, some of which it has served for longer than a decade. Among others, busSTRUT's national clients include iconic brands such as American Eagle, Victoria's Secret, Yale University, Staples, and L.L. Bean.

26.      As part of its business, busSTRUT supplies a proprietary, superior, and environmentally conscious Heavy Duty Track lighting system to national retailers that can support general light fixtures and architectural décor such as wood beams, while, at the same time, attaching directly to building structure. BusSTRUT's track lighting system can affix general and accent lights, and it can be mounted from building structures at up to 10-foot intervals.

27.      BusSTRUT's product in a Target store is shown in the below picture:



28.     BusSTRUT's business model depends on educating customers about the advantages of its Heavy Duty Track.[3]  It also provides customized shop drawings for each project, and offers construction bid management services, which allows customers to creatively use its System.

29.     Because busSTRUT maximizes flexibility for customers who choose to remodel, a retail space with busSTRUT can be reconfigured and the material reused, which saves on both construction and environmental costs.  BusSTRUT's System also allows customers to save substantially on labor costs because it is significantly easier (and less costly) to assemble than

---

[3] BusSTRUT's System is also able to simultaneously function as a power distribution system by "dropping power" to the floor (i.e., to power refrigeration and display cases through power cords).  Target used this additional functionality for its "Super Target" stores.  This additional functionality can be seen in the above picture.

typical track lighting systems.  Beyond this, busSTRUT's value to customers stems from its ability to hold décor without secondary support, along with its ability to hang items such as décor at intervals of up to 10 feet.  Unlike typical light duty track, busSTRUT's System can hold substantial weight without secondary support (again, at intervals of up to 10 feet), which provides the retailer with distinct architectural benefits.

30.     An example of busSTRUT's capabilities, such as its ability to hold weight without secondary support, are reflected in the following picture:



## C.     Target's Initial Heavy Duty Track "Pilot" Program with BusSTRUT.

31.     In early 2015, Target came to busSTRUT in search of a way to efficiently hang general and accent light fixtures below their stores' ceilings, in electrical grid configurations, while also sometimes supplying mechanical support for décor boards or heavy lighting fixtures.  This need is common among large retailers and is one of the primary reasons why busSTRUT's System is so attractive to retailers.

32.     In 2015, at Target's request, busSTRUT met with Target several times to discuss the benefits, and potential use of, its System.  As part of these discussions, busSTRUT discovered that Target was not using Heavy Duty Track in any of its new stores or remodels, but instead only used "light duty" track, which attached to tile ceilings and which used the tile ceilings (as opposed to the building structure) as the "support point."  During these meetings, busSTRUT created a customized solution for Target, allowing it to use Heavy Duty Track in certain portions of its stores for holding wood décor and beams, and suspending it directly from the building structure.  This solution also allowed Target to hang general and accent light fixtures together on a common or shared track system.

33.     Pleased with busSTRUT's proposal, Target entered into a Supplier Qualification Agreement (the "SQA") with busSTRUT on September 30, 2015.   *See* Ex. A (Supplier Qualification Agreement).  This agreement expressly anticipated that the Parties "may thereafter enter into a program agreement or other agreement ('Program Agreement') . . . or any other document or communication sent by Target to SUPPLIER to purchase Goods or Services."  *Id*. at ¶ 1.1.  It also made clear that, to the extent any provisions or terms in the SQA conflicted with a Program Agreement, the Program Agreement controlled over the SQA.  *Id*. at ¶ 1.2.

34.     Shortly thereafter, on November 19, 2015, the Parties entered into a "Program Agreement for Goods and Services," which established the terms by which busSTRUT would fulfill Target's Heavy Duty Track requirements during the term.  *See* Ex. B (Program Agreement). The Program Agreement's term was from November 19, 2015 to December 31, 2016, and it specifically listed each part number that made up busSTRUT's Heavy Duty Track including busSTRUT's accent lights as well as Target's guaranteed pricing for these parts.  *See id*. at pp. 1, 10–11 (Fee Schedule).

35.     The agreement forbade Target from switching to another Heavy Duty Track supplier during the term of the agreement and required Target to purchase its requirements from busSTRUT.  In exchange, busSTRUT committed to, *inter alia*, fixed pricing during the term and to provide the product on demand.

36.     At the time the Parties entered into the Program Agreement, Target had not yet decided on a "national" rollout of Heavy Duty Track, so its initial agreement with busSTRUT served as a "pilot" or "feasibility test" for a nationwide, exclusive rollout of Heavy Duty Track. To that end, during the term, busSTRUT's product was installed in approximately 50 Target stores. The "pilot" program went exceptionally well.  busSTRUT met all of Target's requirements for Heavy Duty Track at the specified pricing under the agreement.  No other supplier provided Target with Heavy Duty Track for its new stores and remodels during this period, and Target continued to be satisfied with busSTRUT's product and services during this period.

**D.     Target Invites BusSTRUT to Submit a Proposal to Fulfill Target's Heavy Duty Track Requirements for Another Term.**

37.     In September 2016, after the successful "pilot" program, Target invited busSTRUT to bid on a Request for Proposals ("RFP") for a two-year term (2017-2018) of "Heavy Duty" Track.[4]  In the bid request, Target's specifications for Heavy Duty Track included, among other requirements, that it be (i) "capable of supporting track light heads, owner provided light fixture and Architectural 'wood beams,'" and (ii) capable of being "suspended from the building structure."  Target's bid request also asked, "What percent discount would you offer to be awarded a 3 year contracts [sic] instead of the standard 2?"

38.     busSTRUT and multiple other companies participated in the RFP, including busSTRUT's competitor Conservation Technology of Illinois, LLC ("ConTech").

---

[4] The Heavy Duty RFP was also referred to as the Track Lighting RFP.

39.     After busSTRUT submitted its bid, Target invited busSTRUT to its headquarters in Minneapolis, Minnesota for a day-long, in-person meeting on November 10, 2016 to engage in further negotiations regarding the "RFP proposal for the Track lighting program." *See* Ex. C (Email from G. Gellert to K. Graham (Nov. 2, 2016)).  Target made clear that it wanted to discuss with busSTRUT "our relationship, agreements, and related pricing," as well as "pricing offers and new agreements between Target and Architectural Busstrut *for our future business*":

| | |
|---|---|
| From: | Kalen.Graham |
| Sent: | Wednesday, November 2, 2016 1:21 PM CDT |
| To: | LARRY GELLERT; Greg Gellert |
| CC: | Doyle.Trankel |
| Subject: | Architectural Busstrut Pricing Discussions |
| Importance: | High |

Larry / Greg,

Thank you for providing your RFP proposal for the Track lighting program.  We appreciate the clarifications provided over the past few weeks including the power strip to complete testing. We are conducting discussions with suppliers and would like to invite you to Minneapolis next Thursday, November 10th, 2016 beginning at 9:00am to discuss our relationship, agreements, and related pricing. Please plan on being onsite for the day, however we may not need this full time.

Architectural Busstrut should come prepared to discuss the following items:
- Item Level Pricing
- Capacity, capabilities, lead times, etc. surrounding your current business with Target

We ask that you ensure that decisions makers from your company are present, understanding that the discussion will center around pricing offers and new agreements between Target and Architectural Busstrut for our future business.

Please confirm your availability on this date by EOD Thursday, 11/3/2016 and I will follow up with additional logistical information.

Please let me know if you have any questions.

Thank you,

**Kalen.Graham** | Strategic Sourcing Lead | ⊙ Indirect Sourcing & Procurement COE | 33 South Sixth Street (CC-26300) Minneapolis, MN 55402| 612-304-5445

40.     At the November 10, 2016 meeting, the Parties discussed a continuation of Target's "national rollout," in which Target would continue to exclusively use busSTRUT for all of its Heavy Duty Track requirements, including accent lights, during the term of the agreement.

Multiple Target representatives attended and participated in the meeting, including Trankel (Target's Lead Engineer) and Kalen Graham ("Graham") (Target's Strategic Sourcing Lead).

41.     In a presentation that Graham created and gave during the meeting, Target emphasized its desire to enter an agreement with busSTRUT over the other suppliers who participated in the RFP, including ConTech. Target told busSTRUT that "Target's intent is to reach a deal with Busstrut today." And further, Target told busSTRUT that it had "the unique opportunity today to secure a contract and stop the competitive sourcing event for the heavy duty track lighting program."

42.     At that same meeting, Target also reiterated that if busSTRUT agreed to reduce its pricing, Target would extend the exclusivity term to three years (instead of the original 2-year exclusive term). If busSTRUT met Target's conditions, Target said, it would "award" the Track and LED Track Head Program to busSTRUT "for 3 years."

43.     As Trankel admitted, Target specifically (and cynically) offered these inducements to busSTRUT — including the representations to busSTRUT about being able to secure a contract and stop Target's search for other supplier sources — in the ███████ that they would be ███████ ███████████████████████████████.

44.     And Target's ███████ proved prescient. busSTRUT was understandably reluctant to reduce its prices. But the prospect of Target "stopping the competitive sourcing event" for an additional year, i.e. through 2019, was very enticing; whatever money it lost through lower prices, it could make up for in an additional year of volume. Accordingly, after some discussion, busSTRUT accepted Target's offer. Target was thrilled. At the conclusion of the meeting, Graham and Trankel told busSTRUT it had "won" and congratulated busSTRUT on the "awarded business."

13

45.     busSTRUT's acceptance was, of course, explicitly premised on Target's representation and agreement to extend the term of its exclusive supply agreement an additional year.  Indeed, as Trankel admitted, Target was counting on this being the case.  Obtaining an additional year of exclusivity was precisely why Target believed its offer would be so "attractive" to busSTRUT.

46.     Unfortunately, as busSTRUT subsequently learned, Target made this offer with no intention to actually honor it.  As Mr. Trankel has admitted in surprisingly frank testimony, notwithstanding all the promises and representations it made to busSTRUT during the agreement negotiations, Target never actually intended to utilize busSTRUT as its exclusive supplier over the promised three-year term.  In his own words, ███████████████████████████████ ████████████████████████████████ He explained that this ██████ involved Target dangling the false promise of an additional year of volume — that Target is ██████████████████ ████████████████████████████████ — as an inducement ████████████████████ ██████████████████

47.     Target now claims that it never promised busSTRUT any exclusivity.  But Target's own documents and corporate representative witness testimony directly contradict this claim.  And for good reason: it makes zero economic sense.  What rational company would find "attractive" the offer to reduce its prices for three years in exchange for an additional year of a *non-exclusive* contract?  This illusory promise would have hardly been an effective ██████████████████ ████████████████████ a fact of which Target's skilled negotiators were surely aware.  Which is why Target instead made the false promise about a ███████████████ for ███████████████ described by Trankel during his deposition.

48.     But that's not the only lie that Target told busSTRUT in an effort to induce busSTRUT to enter the agreement at reduced pricing.  During the parties' negotiations, busSTRUT explained to Target that it would require twelve-weeks lead time on Target's orders, so that busSTRUT had sufficient time to fulfill the orders.  To account for that, the Parties included in the Amended Program Agreement a provision requiring Target to provide "12 weeks based on commit email" from Target.  Unbeknownst to busSTRUT, however, Target knew that it could never provide that amount of lead time to busSTRUT.  Indeed, as discovery has revealed, Target's own employee Laurie Smith explained to Graham that it was "impossible" to provide twelve-weeks lead time.  Target knew so at the time it entered the Amended Program Agreement wherein it promised otherwise.

49.     In short, Target made its false representations with the intention to induce busSTRUT to act in reliance on them.  And busSTRUT did so in entering the contract described below.  Had busSTRUT known the truth — that Target never intended to utilize busSTRUT as its exclusive supplier for three years — busSTRUT would not have reduced its pricing and would not have executed the contract.

**E.      Target and BusSTRUT Enter Into an Exclusive Three-Year Supply Contract.**

50.     Following these negotiations, the Parties agreed that Target would exclusively use busSTRUT, and that busSTRUT would supply Target with all of Target's Heavy Duty Track requirements, including accent lights, for an approximate three (3) year term starting on November 11, 2016 and ending on December 31, 2019.  This agreement was memorialized in an Amendment to the Program Agreement.  *See* Ex. D (Amendment Number 1 to Program Agreement).

51.     These requirements were referred to by the Parties at various times as "Lighting Materials," "Busway," "Track Lighting," and "Heavy Duty Track."  The agreement specifically

listed each part number that made up busSTRUT's Heavy Duty Track, including busSTRUT's accent lights, as well as Target's guaranteed, reduced pricing for these parts. *Id*. at pp. 4-5.

52.     Target's representations to busSTRUT regarding the exclusive nature of the Parties' requirements contract was also memorialized in a contemporaneous email chain between the Parties in which Target acknowledged that busSTRUT was awarded the "Bussway and LED Head Program for 3 years" and congratulated busSTRUT "on the awarded business!"  *See* Ex. E (Email from Kalen Graham (Nov. 10, 2016)).

53.     This email chain even included specific part numbers for busSTRUT's product and the corresponding pricing agreed to by the Parties which was subsequently memorialized in the agreement as well.

54.     After signing the agreement, busSTRUT responded to Target's email stating they "just signed the 2017-2019 agreement" and "will continue to assure the roll-out goes smoothly":

---

**From:** Greg Gellert [mailto:ggellert@busstrut.com]
**Sent:** Friday, November 11, 2016 5:54 PM
**To:** Kalen.Graham <Kalen.Graham@target.com>
**Cc:** Dana.Nickos <Dana.Nickos@target.com>; Dan.Markus <Dan.Markus@target.com>; Doyle.Trankel <Doyle.Trankel@target.com>; LARRY GELLERT <lmgellert@busstrut.com>; Claus.Emmer <Claus.Emmer@target.com>; Laura.Little <Laura.Little@target.com>; Michael Gellert <mgellert@busstrut.com>
**Subject:** [EXTERNAL] Re: busSTRUT Price Discussion Recap

Hi Kalen,

I have just signed the 2017-2019 agreement.

busSTRUT appreciates the opportunity, and will continue to assure the roll-out goes smoothly.

It was a pleasure working with you, along with the entire Target team. Hope you have a great weekend.

Thanks,
Gregory Gellert
VP and General Counsel| busSTRUT | looks BETTER, works BETTER, cost LESS
(614) 933-8695 ext. 1004 | www.busSTRUT.com
921 Eastwind Dr Ste 126A, Westerville OH 43081
ggellert@busstrut.com

Sent from Outlook for iOS

---

*See* Ex. F (Email from G. Gellert to K. Graham (Nov. 11, 2016)).

55.     Notably, Target responded by stating "[w]e are looking forward to continuation of business," confirming the continuation of the agreement to exclusively fulfill its Heavy Duty Track requirements for the next three years (November 11, 2016 to December 31, 2019).  *Id*.

56.     The Parties' contract required Target to fulfill all needs for Heavy Duty Track, including accent lights, exclusively through busSTRUT.  The exclusive nature of the agreement meant that there was no risk of substitution because busSTRUT would be Target's exclusive supplier for the term.

57.     Amendment Number 1 also required that busSTRUT "make available their engineering team to work with Target as requested" and that goods be shipped "complete, on time and without defects."  *See* Ex. D, at p. 1.

58.     Likewise, Amendment Number 1 also required busSTRUT to provide "prompt and knowledgeable service, proactive and timely communication, and responses within 4 hours with resolution (action plan) with 12 hours."  *Id*. at p. 2.

59.     BusSTRUT was also required to have a "dedicated and single point of contact with back up who is available Monday through Friday during regular business hours."  *Id*.

60.     Further, busSTRUT was required to provide "a dedicated project manager to engage in project management, track orders, and provide proof of delivery as requested," "provide daily assistance," and be available for "daily communication for Target" and "[w]eekly/monthly conference calls as required with in person meetings as necessary."  *Id*. at p. 2.

61.     To that end, BusSTRUT expended substantial resources teaching Target to configure the Heavy Duty Track in Target stores.  This included providing diagrams for energy code compliance, designing a "saddle bracket" method for mounting décor beams to Heavy Duty

Track, customizing busSTRUT's power drops to balance flexibility with Target's aesthetic preferences, and customizing installation instructions for Target contractors.

62.     In short, busSTRUT taught Target to implement the Heavy Duty Track in its stores, which is a complicated and difficult process.  BusSTRUT would not have done so if it had known Target would later "substitute" in another supplier in violation of its contractual obligations to busSTRUT.

63.     BusSTRUT was also required to provide "installation Drawings, and customized Bill of Materials based on such drawings, for each Target project."  *Id*. at p. 3.

64.     BusSTRUT was even required to maintain a "reserve/safety stock in its warehouse through the agreement period at no cost to Target as projects may have 'adder materials' while the site is being installed, as site-conditions provide variables that cannot be accounted for in Bill of Material calculations."  *Id*. at p. 3.

65.     Section 1.3 contained a detailed pricing list for part numbers and Target's negotiated, guaranteed pricing for each.  *Id*. at p. 4.  Notably, this pricing was heavily negotiated and lower than the pricing in the prior Program Agreement.  *Id*.

66.     As describe above, BusSTRUT agreed to such lower pricing based on Target's agreement to fulfill its requirements through busSTRUT for an additional year (2019).

**F.     Target Initially Performs Consistent with Its Agreement.**

67.     For over a year, busSTRUT seamlessly satisfied Target's requirements for Heavy Duty Track, including accent lights, for hundreds of new stores and remodels across the country, and Target never indicated to busSTRUT that busSTRUT was not its exclusive supplier during that time.  This resulted in millions of dollars of revenues to busSTRUT.

68.     Moreover, busSTRUT continued to expend substantial resources and dedicate time to providing guidance to Target as to how to effectively configure and lay out Heavy Duty Track

in Target stores.  BusSTRUT also promptly shipped material for dozens of stores **on the same day**; as Target's "Flight" construction schedule required materials in "waves," sometimes Target needed more than 50 stores worth of busSTRUT to be drop-shipped to the respective 50 Target stores across the country all in the same week.

69.     On November 11, 2016, the day busSTRUT was awarded the "Bussway and LED Head Program for 3 years," busSTRUT was a small $5 million per year business with fewer than 10 employees, operating out of a 4,500 square foot office.  To fulfill Target's massive requirements, busSTRUT moved to a 32,500 square foot combined office-warehouse facility and hired more than 10 additional employees.  Notably, three such employees had to be hired simply to fulfill the contractually required task of "installation Drawings, and customized Bill of Materials based on such drawings, for each Target project." Additional employees were hired to have the capacity to ship dozens of Target stores simultaneously.

70.     During the term of the agreement, Target regularly issued to busSTRUT its "plans" and "schedules" for its upcoming new stores and remodels.  This was often done with reference to particular "Flights" and in the form of excel spreadsheets with hundreds of line-items reflecting information about each individual store which busSTRUT would supply.  BusSTRUT used these plans and schedules to purchase sufficient material and hire staff to ensure busSTRUT could meet Target's actual requirements.

71.     Given the substantial "ramp up" in Target stores anticipated in the latter half of 2018 and 2019,[5] the future looked bright for busSTRUT.  To that end, busSTRUT began

---

[5]     *See, e.g.,*   https://corporate.target.com/press/releases/2018/03/target-announces-plans-to-accelerate-multiyear-str ("This year, Target will nearly triple the size of its remodel program, updating more than 300 stores around the country.").

purchasing material, and hiring additional employees in anticipation of the substantial business with Target. For example, busSTRUT had millions of dollars in customized busSTRUT and light fixtures manufactured to fulfill Target's 2018 and 2019 requirements.[6] No other supplier provided Target with Heavy Duty Track for its new stores and remodels until, upon information and belief, Target piloted a competing product in the latter half of 2017.

72.    Indeed, as of April 2018, busSTRUT had received construction schematics and schedules for more than 100 upcoming "Flight 5" Target store remodels that Target expected busSTRUT to supply. Accordingly, busSTRUT further invested in fulfilling these requirements for Target by, for example, customizing Installation Drawings and Bill of Materials based on those drawings. busSTRUT relied on receipt of such construction schematics and schedules, using them as a basis for creating Installation Drawings and customized Bill of Materials for many "Flight 5" Target projects. Unbeknownst to busSTRUT, Target never intended to uphold its end of the bargain and breach its contractual obligation by sourcing its requirements through other suppliers.

## G.    Target Breaches Its Contract With BusSTRUT.

73.    At the same time Target was providing busSTRUT with its construction schematics and schedules, Target was also secretly meeting with busSTRUT competitor ConTech, which sells a product called LuxBeam that competes with busSTRUT's System. LuxBeam is the product that Target ultimately substituted in for busSTRUT's System. In fact, not more than seven months after inducing busSTRUT to enter the Amended Program Agreement, Target was going behind busSTRUT's back working to replace busSTRUT with ConTech, notwithstanding its representations and promises to busSTRUT. Such discussions took place, at minimum, on September 12, 2017, February 15-16, 2018, and April 3, 2018. As Mr. Trankel has admitted during

---

[6] To this day, busSTRUT still has more than $1,000,000 in customized busSTRUT material collecting dust in its warehouse due to Target's breaches.

his deposition, the purpose of these meetings was for Target to discuss purchasing LuxBeam instead of busSTRUT, in breach of the Parties' exclusive requirements contract.

74.     On April 9, 2018, Target announced to busSTRUT via a conference call that, despite the Parties' agreement, it would no longer use busSTRUT in its Pfresh store remodels.[7] Suddenly, the more than 90 Target store construction schematics and schedules that busSTRUT had already relied on to create customized Installation Drawings, and customized Bill of Materials based on such drawings, were cancelled.   More than $1,000,000 of custom inventory that busSTRUT manufactured for Target became an enormous burden.

75.     On that same conference call, Target informed busSTRUT that it would still use busSTRUT for 44 of the 134 stores in Flight 5 (i.e., the remaining "SuperTarget" stores in the Flight).   Indeed, busSTRUT continued receiving new construction schematics for such SuperTargets.[8]  BusSTRUT relied on those schematics and continued creating customized Install Drawings and Bills of Materials for these remaining stores.  Despite this representation, a Target electrical engineer, Ronald Sherman, provided the electrical design for those SuperTargets to alternate vendors on April 27, 2018.  Upon information and belief, multiple Target employees also attended a video conference call with alternate vendors around this same time.  On May 1, 2018, Ronald Sherman sent a cryptic one-sentence email to busSTRUT's design director: "How long are the drop cords you provide for cases fed from busSTRUT on super targets?"

76.     Similarly, on April 6, 2018, Ronald Sherman emailed busSTRUT's design director: "We are planning on adding Busstrut system to HQ Grocery Lab, can you create installation

---

[7] To this day, busSTRUT continues to receive occasional "adder" orders, meaning orders that simply add on to projects that busSTRUT previously fulfilled for Target.  For example, "adder" material was ordered for a Pfresh store on April 4, 2019.

[8] In fact, Target continued to provide busSTRUT with its "Pfresh" construction schematics, despite its April 9, 2018 announcement to busSTRUT that it would no longer use busSTRUT's System in Pfresh stores.

drawings and provide a Quote based off attachments . . . please design a flexible system."  On April 11, Ronald Sherman responded to the requested quote by saying, "Looks good." However, the following day, Ronald Sherman emailed a competing vendor, stating, "We are planning on adding luxbeam system to HQ Grocery Lab, can you provide a Quote based off attachment?" busSTRUT was never told that it wasn't getting this high-profile Target headquarters project.

77.     On May 17, 2018, Target finally informed busSTRUT that it would cease using busSTRUT in Super Target stores as well.

78.     For the remainder of 2018 and into 2019, Target has continued to use Heavy Duty Track, fulfilled via new suppliers, in violation of Target's agreement with busSTRUT.

79.     These actions constitute material breaches of the Parties' agreements.  They also constitute breaches of Target's regular and continued promises to use busSTRUT for its Heavy Duty Track requirements including accent lights.

## CAUSES OF ACTION

### COUNT ONE

**For Breach of Contract Against Target**

80.     BusSTRUT hereby incorporates by reference the preceding paragraphs of the Complaint as if the same were set forth fully herein.

81.     As alleged herein, Target and busSTRUT had an enforceable agreement, as reflected in Amendment Number 1 to the Program Agreement.

82.     The Program Agreement and Amendment Number 1 constitute a valid, binding, and enforceable contract between Target and busSTRUT.

83.     As explained above, this contract required Target to exclusively use busSTRUT to fulfill its Heavy Duty Track requirements including accent lights from November 11, 2016 to December 31, 2019.

84.     As explained above, Target has repeatedly breached this agreement and continues to do so by sourcing its requirements through other suppliers.

85.     Target's breaches have proximately caused busSTRUT to suffer damages.

86.     BusSTRUT has been, and continues to be, damaged as a result of Target's breaches as alleged above.

87.     Accordingly, BusSTRUT is entitled to recover damages against Target, including for lost profits (both from lost sales and sales previously made at a discounted rate), for pro bono and reduced price services previously provided to Target in anticipation of performance under the contract, and expenditures made to fulfill busSTRUT's own continuing obligations under the contract.

88.     WHEREFORE, Plaintiff busSTRUT respectfully requests that this Court enter Judgment in its favor on Count One and against Target and grant busSTRUT the relief set forth in its Prayer for Relief.

## COUNT TWO

### For Breach of the Implied Covenant of Good Faith and Fair Dealing

89.     BusSTRUT hereby incorporates by reference the preceding paragraphs of the Complaint as if the same were set forth fully herein.

90.     As alleged herein, Target and busSTRUT had an enforceable agreement as reflected in Amendment Number 1.

91.     The Program Agreement and Amendment Number 1 constitute a valid, binding, and enforceable contract between Target and busSTRUT.

92.     As explained above, this Agreement required Target to exclusively use busSTRUT to fulfill its Heavy Duty Track requirements including accent lights from November 11, 2016 to December 31, 2019.

93.     Under Minnesota law, every contract includes an implied covenant of good faith and fair dealing, requiring that one party not hinder the other party's performance of a contract and requiring a party in a contractual relationship to refrain from arbitrary and unreasonable conduct that has the effect of preventing the other party to the contract from receiving the fruits of the contract.

94.     Target breached this covenant of good faith by arbitrarily, unreasonably, and without notice refusing to continue to use busSTRUT to source its requirements.  Target continues to this day to breach this covenant.

95.     While under contract with busSTRUT, Target sought out and received quotes for substitutes of busSTRUT.

96.     While under contract with busSTRUT, Target provided busSTRUT construction schematics and store schedules that it knew busSTRUT would rely on, and then cancelled the use of busSTRUT in all such stores.

97.     Further, Target provided no notice of its inappropriate decision to "substitute" busSTRUT notwithstanding that, upon information and belief, Target was quoting and looking for substitutes for an extended period of time.  This is particularly troublesome in light of Target's repeated providing of schedules and projections to busSTRUT, knowing that busSTRUT would reasonably act on the same.

98.     Moreover, notwithstanding that Target and busSTRUT had contractually agreed to certain pricing, Target did not provide busSTRUT any opportunity to address and/or respond to any purported cost concerns.

99.     Target's breaches have proximately caused busSTRUT to suffer damages.

100.     BusSTRUT has been, and continues to be, damaged as a result of Target's breaches as alleged above.

101.     BusSTRUT is entitled to recover damages against Target, including for lost profits (both from lost sales and sales previously made at a discounted rate), for pro bono and reduced price services previously provided to Target in anticipation of performance under the contract, and expenditures made to fulfill busSTRUT's own continuing obligations under the contract.

102.     WHEREFORE, Plaintiff busSTRUT respectfully requests that this Court enter Judgment in its favor on Count Two and against Target and grant busSTRUT the relief set forth in its Prayer for Relief.

## COUNT THREE

### For Breach of An Implied In Fact Contract Between Target and BusSTRUT

103.     BusSTRUT hereby incorporates by reference the preceding paragraphs of the Complaint as if the same were set forth fully herein.

104.     BusSTRUT pleads this cause of action in the alternative.

105.     Taking into account the circumstances, statements of the Parties, acts of the Parties, communications, and course of dealings/conduct between the Parties, the law implies a contract by which busSTRUT would supply Target with its Heavy Duty Track requirements including accent lights until the end of 2019.

106.     As explained above, Target has repeatedly breached this contract and continues to do so.

107.     Target's breaches have proximately caused busSTRUT to suffer damages.

108.     BusSTRUT has been, and continues to be, damaged as a result of Target's breaches.

109.     BusSTRUT is entitled to recover damages against Target, including for lost profits (both from lost sales and sales previously made at a discounted rate), for pro bono and reduced

price services previously provided to Target in anticipation of performance under the contract, and expenditures made to fulfill busSTRUT's own continuing obligations under the contract.

110.     WHEREFORE, Plaintiff busSTRUT respectfully requests that this Court enter Judgment in its favor on Count Three and against Target and grant busSTRUT the relief set forth in its Prayer for Relief.

## COUNT FOUR

### Promissory Estoppel Against Target

111.     BusSTRUT hereby incorporates by reference the preceding paragraphs of the Complaint as if the same were set forth fully herein.

112.     BusSTRUT pleads this cause of action in the alternative.

113.     Target made the overarching promise to use busSTRUT to exclusively fulfill its Heavy Duty Track requirements including accent lights until the end of 2019.

114.     The circumstances, statements of the Parties, acts of the Parties, communications between the Parties, and course of dealings/conduct between the Parties are all consistent with this overarching promise by Target.

115.     Target intended to induce busSTRUT to rely on this promise including, but not limited to, in connection with busSTRUT agreeing to reduced pricing and busSTRUT providing substantial guidance and work in relation to implementing Heavy Duty Track configurations in Target stores.

116.     BusSTRUT reasonably relied upon this promise in a myriad of ways to its detriment.  This includes, but is not limited to, bulk purchasing substantial inventory for the Target business that busSTRUT is now left holding, hiring employees to service the Target business, providing substantial price breaks to Target, providing the aforementioned guidance and work in

relation to implementing the Heavy Duty Track configurations in Target stores, and otherwise preparing to meet Target's requirements until the end of 2019.

117.    Enforcement of Target's promise is required to prevent an injustice.

118.    BusSTRUT has been damaged by Target's failure to keep its promise and is entitled to recover its damages from the same, including for lost profits (both from lost sales and sales previously made at a discounted rate), for pro bono and reduced price services previously provided to Target in anticipation of performance under the contract, and expenditures made to fulfill busSTRUT's own continuing obligations under the contract.

119.    WHEREFORE, Plaintiff busSTRUT respectfully requests that this Court enter Judgment in its favor on Count Twelve and Target and grant busSTRUT the relief set forth in its Prayer for Relief.

## COUNT FIVE

### Unjust Enrichment

120.    BusSTRUT hereby incorporates by reference the preceding paragraphs of the Complaint as if the same were set forth fully herein.

121.    BusSTRUT pleads this cause of action in the alternative.

122.    BusSTRUT conferred numerous benefits on Target, including reduced price services and materials, education regarding the configuration of Heavy Duty Track for use in Target stores, diagrams for energy code compliance, a specially designed "saddle bracket" method for mounting décor beams to Heavy Duty Track, customized busSTRUT power drops, and customized installation instructions for Target contractors.

123.    Target accepted each of these benefits and in fact continues to use and benefit from them to this day.

124.     Target has not properly compensated busSTRUT for these benefits.

125.     Permitting Target to retain these benefits without compensation is inequitable as, *inter alia*, busSTRUT only provided them on the understanding that receipt of Target's continued Heavy Duty Track business would compensate busSTRUT for its provision of these benefits. Target and its employees knew these were the circumstances governing busSTRUT's provision of these benefits.

126.     Yet Target unilaterally and unjustifiably ceased giving its continued Heavy Duty Track business to busSTRUT.

127.     Accordingly, busSTRUT is entitled to compensation from Target for these and other benefits conferred upon Target without proper payment.

128.     WHEREFORE, Plaintiff busSTRUT respectfully requests that this Court enter Judgment in its favor on Count Five and Target and grant busSTRUT the relief set forth in its Prayer for Relief.

## COUNT SIX

### Fraudulent Inducement

129.     BusSTRUT hereby incorporates by reference the preceding paragraphs of the Complaint as if the same were set forth fully herein.

130.     As set forth above, Target made false representations of material fact regarding utilizing busSTRUT as its exclusive supplier during the three-year term and providing busSTRUT twelve-weeks lead time. Those false representations were susceptible of knowledge.

131.     As Target's deposition testimony and conduct after signing the Amended Agreement make clear, Target made those representations with knowledge of their falsity or

without knowing whether they were true or false with the intention to induce busSTRUT to act in reliance thereon and enter the Amended Program Agreement at reduced pricing for an additional year.

132.    Target's false representations caused busSTRUT to act in reliance thereon and busSTRUT suffered pecuniary damage as a result of the reliance.

133.    WHEREFORE, Plaintiff busSTRUT respectfully requests that this Court enter Judgment in its favor on Count Six and Target and grant busSTRUT the relief set forth in its Prayer for Relief.

## CONDITIONS PRECEDENT

134.    All conditions precedent to the contract or claims alleged in this case have been performed, excused, waived or otherwise satisfied as required by applicable law including, but not limited to, the presentment of a claim or claims for attorneys' fees.

## ATTORNEYS' FEES, COSTS, AND EXPENSES INCURRED

135.    BusSTRUT incorporates the preceding paragraphs as if fully set forth herein.

136.    BusSTRUT is entitled to recover the full amount of its reasonable attorneys' fees costs, and expenses incurred in pursuing its claims in this action.

137.    BusSTRUT requests an award of reasonable attorneys' fees, expenses, and costs incurred with respect to any cause of action where such is recoverable.

## JURY TRIAL DEMAND

138.    Pursuant to Federal Rule of Civil Procedure 38, Plaintiff busSTRUT hereby specifically demands trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff busSTRUT prays for judgment against Defendant Target as follows:

(1) For all general and special damages recoverable in an amount greater than $50,000, including those specified in the Counts above;

(2) For pre-judgment interest on all such damages at the legal rate;

(3) For costs of suit incurred herein, including reasonable attorneys' fees, for all causes of action where such is recoverable; and

(4) For such other and further relief as the Court deems just and proper.

Date:  January 14, 2021                     KIRKLAND & ELLIS LLP

                                            */s/ Jeremy A. Fielding*
                                            Jeremy A. Fielding (*admitted pro hac vice*)
                                            Texas State Bar No. 24040895
                                            Email: Jeremey.fielding@kirkland.com
                                            Michael Kalis (*admitted pro hac vice*)
                                            Texas State Bar No. 24092606
                                            Email: Michael.kalis@kirkland.com
                                            901 Main Street
                                            Dallas, Texas 75202
                                            Tel: (214) 972-1755
                                            Fax: (214) 972-1771

                                            and

                                            ABBOTT LAW OFFICE

                                            Gregory A. Abbott
                                            Minnesota Reg. No.0209491
                                            gabbott@abbottlaw.us
                                            P.O. Box 24443
                                            Minneapolis, Minnesota 55424
                                            Telephone:  612.217.2440

                                            ATTORNEYS FOR PLAINTIFF

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 14, 2021, a true and correct copy of the foregoing was served through ECF filing on all counsel of record.

<u>*/s/ Jeremy A. Fielding*</u>
Jeremy A. Fielding