# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| **ARCHITECTURAL BUSSTRUT** | § | |
| **CORPORATION d/b/a busSTRUT** | § | |
| | § | |
| **Plaintiff,** | § | Case No. 0:19-cv-968-DSD-ECW |
| | § | |
| **v.** | § | Judge David S. Doty |
| | § | |
| **TARGET CORPORATION** | § | Magistrate Judge Cowan Wright |
| | § | |
| **Defendant.** | § | |
| | § | |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON DEFENDANT'S COUNTERCLAIM

## <u>INTRODUCTION</u>

This case is about Defendant Target Corporation's ("Target") decision to renege on a contract it had with Plaintiff Architectural Busstrut Corporation ("busSTRUT"). BusSTRUT—a small, family-owned-and-operated company—supplies a proprietary, heavy-duty track-lighting system ("Track"). BusSTRUT had a contract to supply that system to Target for three years, but Target double-crossed busSTRUT, costing busSTRUT millions of dollars. BusSTRUT brought this action to recover damages for Target's breach of the parties' contract.

Target's flagrant wrongdoing is thus the heart and soul of this case. But the present motion for summary judgment centers on, and seeks dismissal of, Target's lone counterclaim. In that bogus counterclaim, Target alleges that *busSTRUT* breached the parties' contract by overcharging for certain Target-specific light fixtures ordered on an

expedited basis.  But the undisputed record shows that the price busSTRUT charged for the expedited light fixtures ($███) was a part of the parties' contract.

The parties' course of performance likewise confirms the propriety of the $██ price point.  BusSTRUT was transparent in its pricing and repeatedly notified Target of the cost of the expedited fixture.  Target, for its part, *twice* affirmatively approved the expedited-fixture price in the formal price lists it required from busSTRUT.  And, for nearly a year-and-a-half and on *hundreds* of occasions, Target submitted purchase orders to busSTRUT approving the price and then paid the full balance of those orders.

In short, as a matter of law and undisputed fact, BusSTRUT is entitled to summary judgment in its favor on Target's sole counterclaim.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.      BusSTRUT and Target Enter into a Requirements Contract.

BusSTRUT and Target's relationship began in early 2015, when Target used busSTRUT Track purchased through a third-party sales representative to install a "███" of busSTRUT's system at ███████████. (Ex. 3.)[1]  A few months later, Target again purchased busSTRUT Track through a third party for installation in a single retail location in ██████ (Ex. 2, Trankel Dep., at 97.)   In both locations, the product was a hit.  Target wanted to start doing business directly with busSTRUT, but, as a condition of entering into such a relationship, required that busSTRUT first execute a

---

[1] All "Ex." references refer to the exhibits to the Declaration of Emmett E. Robinson, submitted concurrently herewith.

"Supplier Qualification Agreement for Goods and Services" ("SQA"). (Ex. 4, SQA, § 1.1.)
The SQA went into effect on September 30, 2015, and ████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████ (*See id.* at 1, *et seq.*) The parties

subsequently entered into a "Program Agreement for Goods and Services" ("Program

Agreement") effective November 19, 2015. (Ex. 5, Program Agreement, at 1.) During

this same time period, Target agreed to purchase busSTRUT's system for installation in █

███████████████████████████████. (Ex. 2, Trankel Dep., at 99.) Target was "really

happy with the product." (*Id.* at 171.)

In fall 2016, Target issued a request for proposals ("RFP") seeking bids for

installation of a heavy-duty track-lighting system in additional retail locations as part of its

ambitious plan to remodel over ████ stores over a three-year period. (*Id.* at 212-13; Ex. 6.)

Target asked busSTRUT to bid on the RFP, and busSTRUT won, securing a three-year

Track requirements contract with Target.[2]  (*Id.*; Ex. 7.) As part of this award of business

to busSTRUT, the parties executed "Amendment Number 1 to Program Agreement for

Goods and Services" (the "Amendment") dated November 11, 2016. (Ex. 8, Amendment,

---

[2] Target subsequently breached that contract and switched to a different Track supplier.
That breach is the crux of this case, but not the crux of this motion. As such, it is not
discussed in detail here. It is, however, addressed in busSTRUT's complaint and will
undoubtedly be addressed in busSTRUT's forthcoming opposition to Target's motion for
summary judgment.

at 1.)  The Amendment explicitly required Target to provide busSTRUT with 12 weeks'

lead time on all orders.[3]  Specifically, the Amendment provided:



(*Id.* ¶1.1.)   The Amendment also contained a chart listing each component of the

busSTRUT Track system and the agreed per-unit price of that component for purchases

made pursuant to the terms of the Amendment.  (*Id.* ¶1.3.)  That chart provided that light-

fixtures purchased in compliance with the Amendment would be priced at $███  apiece.

(*Id.* ¶1.3.)

**B.   BusSTRUT Urges Compliance with the Amendment and Makes the Price of Expedited Fixtures Clear.**

On November 14, 2016—the next business day after busSTRUT and Target

executed the Amendment—busSTRUT vice president Greg Gellert ("Gellert") emailed

Kalen Graham (a Target procurement specialist who had negotiated the three-year contract

with busSTRUT) and Laurie Smith (the Target employee charged with implementation of

the contract, including issuance of commit emails and purchase orders) to emphasize the

importance of the Amendment's 12-week lead-time requirement.  Gellert wrote as follows:

---

[3] The Amendment contained limited exceptions, not relevant here, to this 12-week lead-time requirement.

4

█████████████████████████████████████

(Ex. 9 at 3.)

Neither Graham nor Smith responded to the email.  (*See id.*; Ex. 2, Trankel Dep., at 263.)   Gellert thus called Smith the following day, again seeking commitments for upcoming remodels.  (Ex. 9 at 3 (████████████████████████████████.)   Again Smith did not respond.  (Ex. 2, Trankle Dep., at 263.)   Gellert followed up with another email to Smith (copying Graham) the next day, November 16:



(Ex. 9 at 3.)  Smith responded later that day with a list of stores scheduled for remodel in early 2017.  (*Id.* at 2.)  But she still was unable to issue commit emails to busSTRUT for those stores, instead stating, ██████████████████████████████ ████████████████████████████ (*Id.*)

The next day, November 17, Gellert emailed Smith confirming that Target sought to order busSTRUT Track for Target store ██████ (*Id.* at 1.)  He attached what he referred to as a "quote"[4] to the email that both (1) set forth the total cost of the busSTRUT Track system for that store, and (2) broke down that total cost component-by-component.  (*Id.* at

---

[4] busSTRUT typically used the terms "quote" and "estimate" interchangeably.

1, 8.)  Gellert also highlighted in the body of that email what was already made clear in the attached quote:  Target had failed to provide the 12-week notice called for under the Amendment; nevertheless, busSTRUT would honor the prices set forth in the Amendment as to all components of the Track system, with the exception of the light fixture.  *See id.* Because of the short lead time, the fixture would be billed at the pre-Amendment rate of $███ rather than the $████ rate listed in the Amendment.[5]  (*Id.* at 1 (████████████████ ██████████████████████████████████).)  Target approved the quote and issued a purchase order for the full amount of the quote—including the $███ light fixture—on November 21, 2016.  (*Id.*)  Target subsequently made good on its purchase order and paid the full amount of the quote (plus tax and freight), including the $███ per-unit fixture price.  (Ex. 10, Remittance Doc.)

Thus, busSTRUT had made clear in its communications that it was charging the $███ expedited price for the light fixture when Target failed to provide the 12-week lead-time set forth in the Amendment, and Target just as clearly accepted that pricing.  Still,

---

[5] Unlike the other components of the Track system that busSTRUT stocked for Target, the light fixture selected by Target was unique to Target and was of no use to busSTRUT's other customers in the event that busSTRUT, in an effort to anticipate Target's demand in the absence of 12-week commit emails from Target, ended up overstocking the fixture. (*See* Ex. 28.)  Thus, while busSTRUT took on significant risk in maintaining the large inventory of all Track system components required to anticipate Target's demand in the absence of the Amendment-mandated 12-week commit emails, the risk was particularly acute with respect to the fixture.  (*Id.*)  Accordingly, in an effort to be as accommodating as possible, busSTRUT decided only to charge Target for the risk associated with expediting the light fixture while absorbing the risk associated with expediting the other components of the system.  (*Id.*)  That decision to act in generous good faith would prove financially devastating to busSTRUT when Target breached the parties' agreement and turned to a different supplier for its heavy-duty track needs.

busSTRUT strongly preferred that Target would choose to operate within the confines of the Amendment and the 12-week lead-time it provided for, which would have allowed busSTRUT to in turn charge the lower $███ price.  (*See* Ex. 11 at 1.)  Accordingly, the next week—on November 21, 2016—Gellert *again* emailed Smith "to stress the importance of receiving a commit email for February stores as soon as possible." (*Id.*)  He continued:



(*Id.*)  Once again, Target failed to comply with the 12-week requirement.  (*See id.*)

### C.   BusSTRUT Repeatedly Lists the Expedited Fixture in the Target Master Catalog, and Target Repeatedly Approves it.

The days immediately following adoption of the Amendment were by no means the only time busSTRUT made clear to Target that it was charging $██ per expedited light fixture—rather than the $███ contemplated by the Amendment—because of Target's failure to comply with the Amendment's 12-week requirement.  The Amendment also required busSTRUT to ████████████████████████████████ ████████████████████████████████████████ ████████████ busSTRUT uploaded an electronic catalog to Ariba listing each component of its Track system and the price associated with that component at the beginning of December 2016.  (Ex. 12 at 1-2.)

BusSTRUT's catalog, far from voluminous, listed all 25 components of the Track system and their associated prices as set forth in the Amendment.  (*See* Ex. 8, Amendment, ¶1.3; Ex. 13 at 1.)  The catalog also plainly included a ▆▆ line-item accounting for the $▆▆ expedited light fixture.  (*See id.*; Ex. 14 at 2.)  The description for that line-item unambiguously said that it was the Target light fixture and that it was "ONLY for use on rush orders (no 12 week commit email covers the order)."  (*E.g.*, Ex. 13 at 1; Ex. 15 at 1 (same; also noting that "▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆").)

Target affirmatively approved busSTRUT's ▆-item catalog, including the expedited light fixture and its $▆▆ price.  (*E.g.*, Ex. 12 at 1 ("According to the Ariba customer service rep…the catalog has…been approved by Target."; "Awesome job.  You did in one day what most vendors take a month to accomplish.  Thanks."); Ex. 14 (Graham personally noting catalog was "approved"); Ex. 15 at 1; Ex. 1, Graham Dep., at 111-12; Ex. 2, Trankel Dep., at 279-81.)  Target did the same thing in July 2017, when it asked busSTRUT to re-upload the catalog to Ariba due to a Target internal technical issue.  (Ex. 13 at 3-4.)  Again, busSTRUT uploaded the same 26 items with the same 26 descriptions, including the expedited-fixture line-item clearly identified as such.  (*Id.*)  And again Target affirmatively approved the catalog and the $▆▆ expedited fixture price.  (*E.g.*, *id.* at 1-3; Ex. 15 at 1.)

### D. BusSTRUT Issues Hundreds of Quotes that Include the Expedited Fixture Pricing, and Target Issues Hundreds of Corresponding Purchase Orders Incorporating and Accepting it.

From the weeks immediately following the parties' execution of the Amendment in November 2016 all the way to the spring of 2018, busSTRUT supplied its Track for hundreds of Target store remodels. (*See* Ex. 16, Target's Internal Purchase-Order Spreadsheet (cataloging every Target purchase order and the date thereof).) Unfortunately, throughout this entire time period, and despite busSTRUT's repeated pleading, Target *never once* gave the 12 weeks' notice required in order to receive the discounted $ ▮▮ per-unit pricing contemplated by the Amendment. (Greg Gellert Decl. ¶ 2.) Indeed, Target had internally concluded that it was *impossible* to provide the required 12-weeks' notice. (*E.g.,* Ex. 17 at 1 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮).)

With respect to each of these stores, busSTRUT issued a quote to Target that listed the quantity and price of each Track component to be shipped to the store as well as the total price for the Track system in that store. Every one of these quotes made clear that busSTRUT was pricing the light fixtures at the expedited rate ($ ▮▮). Every time, Target issued corresponding purchase orders accepting busSTRUT's quotes in full, and every time Target ultimate paid the precise amounts called for by those quotes and purchase orders. The format of the documents and emails exchanged between busSTRUT and Target to effect these hundreds of orders changed from time to time, but the pattern remained the same: (1) busSTRUT quote including expedited fixture pricing, (2) Target order based on

that quote, then (3) Target payment in full.  Representative examples of this process are described more fully below.

Starting with the very first Track order Target placed post-Amendment—the order for store ███ discussed in Section B above—busSTRUT issued an item-by-item quote[6] to Target that included the $██ fixture pricing.  (Ex. 18.)  Target approved the quote in full and issued a purchase order for the full quoted price.  (*Compare id.* (stating total cost of busSTRUT system, with $██-fixture pricing, to be $██████, *with* Ex. 9 at 1 (Smith providing approval of quote and purchase-order number), *and* Ex. 16 at line 5 (purchase order was for precise $█████ amount quoted).)  Target subsequently paid the full balance due.  (Ex. 10.)

Orders placed by Target on April 4, 2017, serve as further examples of this quote-and-order practice.  On April 1, 2017, busSTRUT's Ellen Robinson sent an email to Smith with the subject line "███████████" (Ex. 19 at 1.)  Robinson attached quotes for eight Target stores to that email.  (*Id.* at 2-9.)  Each quote broke down the Track system to be installed in the given store into component-by-component line items.  (*Id.*)  Each plainly stated that the light fixture was "Expedited."  (*Id.*)  And each plainly stated an expedited cost of $██ per fixture.  (*Id.*)  Smith responded to Robinson's email on April 4, 2017. (Ex. 20 at 1.)  She *reattached* the quotes Robinson had provided (*id.* at 2-9), and assigned each a purchase-order number, thus formalizing the orders and indicating that busSTRUT should move forward as specified in the quotes (*id.* at 1).  With respect to all eight stores,

---

[6] This early document was denominated a "sales order" rather than a "quote" or "estimate."

Target issued the purchase orders in the exact dollar amount—including the cost of the expedited fixture—listed in the corresponding estimates. (*Compare* Ex. 19 at 2, 3, 4, 5, 6, 7, 8, 9, *with* Ex. 16, at lines 689, 3478, 690, 688, 29, 3480, 687, 3479, *respectively*.) And Target similarly paid the balance due on each purchase order in full. (*See* Ex. 21, Remittance Doc., at 1, 2, 1, 1, 5, 3, 1, 2, *respectively*.)

The same practice was in place all the way to 2018, though, again, format changed from time to time. On February 14, 2018, for example, Target emailed busSTRUT and asked the company to fill in prices on a spreadsheet that Target had created for use in the issuance of future busSTRUT quotes. (Ex. 22 at 1 ("███████████████████ ███████████████").) Target's spreadsheet explicitly included a column in which it asked busSTRUT to reiterate the cost of the expedited light fixture. (*Id.* at attachment column Y.) BusSTRUT replied to Target's email on February 16, 2018, attaching Target's spreadsheet with busSTRUT's inputs. (Ex. 23.) That is, busSTRUT had filled in the prices on the spreadsheet as requested—including the $██ cost of the expedited light fixture— and had used the resulting template—again, as requested—to issue quotes for three upcoming Target store remodels. (*Id.* at attachment.) BusSTRUT's quotes plainly included ██ expedited fixtures at $███ apiece for store ████ ██ such fixtures for store ████ and ██ for store ████ (*Id.* at attachment column Z.) Target responded via an email on February 21, 2018, which began "██████████████████████████████████" (Ex. 24 at 1.) Target attached the quote spreadsheet previously sent by busSTRUT and provided a purchase-order number for each of the three store quotes. (*Id.*; Ex. 23.) And here again, Target's own records show that the purchase orders Target issued were for the

precise dollar amounts found in the busSTRUT quotes, which had in turn included $██-expedited-fixture quantities that Target had asked busSTRUT to put in the spreadsheet. (*Compare* Ex. 23 at attachment column AC, *with* Ex. 16 (TAR000001) at lines 106, 1036, 1038.)  Once again, Target subsequently paid the full balance (full quote/purchase-order amount plus applicable taxes and freight) due on all of these purchase orders.  (*See* Ex. 25, Remittance Doc., at 1, 3, 4, *respectively*.)

The quotes, orders, and remittances summarized above are examples only.  This practice was followed continually from the date the Amendment was executed until March 28, 2018, discussed directly below.  (Gellert Dec. ¶ 3.)

### E.   Target Briefly Questions Expedited Pricing but Ultimately Continues to Pay as Agreed and Required.

Target continued to issue purchase orders agreeing to the $██ expedited-fixture cost until late March 2018.  Then, on March 28, 2018, for the very first time, Target issued purchase orders that did not approve the $██ expedited-fixture fee but rather priced the expedited fixtures at $██—the price applicable, pursuant to the Amendment, only when Target provided 12 weeks' notice.[7]  (Ex. 28, at 3.)  But these orders, like *every* order Target

---

[7] This timing was not by chance.  Precisely one week before raising the expedited-fixture price issue, Target signed an agreement with busSTRUT's competitor providing that the competitor would supply a ██████ substitute for busSTRUT's Track.  (*Compare* Ex. 26 at 1, 2 (March 21, 2018 agreement between Target and busSTRUT's competitor adding "█████████████████████" to the parties' contract), *with* Ex. 27 at 1-6 (prior iteration of Target and busSTRUT's competitor's pricing agreement, which did *not* include line items for ██████ Track).)  Target was thus in need of a *post hoc* rationale for this violation of its contract with busSTRUT and apparently concluded that concocting an expedite-fee dispute was its best option.

had ever placed under the parties' requirements contract, did not comply with the 12-week commit requirement.  (*Id.* at 1-2.)

BusSTRUT's Gellert responded this round of Target's purchase orders with a lengthy email to Graham.  (*Id.*)  In that email, Gellert once again explained that the 12-week "███████████████████████████████████████████ ████"; that without them busSTRUT is "essentially blind up until very near shipment dates"; and that Target has never provided the commitment letters "████████████ ██████."  (*Id.* at 1.)  Gellert went on to explain that ensuring on-time delivery in such circumstances was "████████████" and required busSTRUT to carry "an enormous inventory risk." (*Id.*) "████████████████████████████████████████████ ████████████████████████████" in the absence of commit letters. (*Id.*) He continued:



\*\*\*



(*Id.* at 1-2.)

After further discussions with Target, busSTRUT billed Target for the $███ "expedite fee" missing from the March 28, 2018 purchase orders (*i.e.*, the difference between the $██ expedited-fixture price and the $██ price applicable to orders placed in compliance with the 12-week commit-letter requirement).  (Ex. 29 at, *e.g.*, 26 (store ███ 91 (store ███ 93 (store ███ 117 (store ███ 123 (store ███ 127 (store ███ 155 (store ████ (showing that busSTRUT invoiced Target for the $███ per-fixture "Expedite" fee when Target sought to use the $███ price without providing 12 weeks' notice).)  <u>Target agreed to pay, and paid, those invoices.</u>  (*E.g.*, Ex. 25, Remittance Doc., at 3, 2, 2, 3, 2, 3, 2, *respectively* (showing Target paid each of the exemplar invoices from Ex. 29, including the $███ expedite fee in full (figures here are the per-store prices from Ex. 29 plus tax and freight as applicable)); Ex. 2, Trankel Dep., at 367 ("████████ ████████████████████████████████████████).)  Going forward, for Target's meager remaining orders to busSTRUT, Target voluntarily reverted to issuing purchase orders for the fixture at $██ apiece.  (*E.g.*, Ex. 16 at line 4014 (recording September 2018 purchase order of 26 light fixtures for $████, or $██ each).)

### F.   BusSTRUT Sues Target, and Target Counterclaims.

On April 18, 2019, busSTRUT filed this action against Target, claiming Target switched to busSTRUT's competitor as its primary supplier of Track, in violation of

busSTRUT's exclusive requirements contract and Target's promises.   Target filed a counterclaim against busSTRUT on May 31, 2019.  (ECF 16.)  Flying in the face of the undisputed facts summarized above, Target's counterclaim alleges that busSTRUT breached the parties' agreement by "submitting invoices charging Target an expedited cost of $██ per light fixture, when the Agreement specifically set the price at $███ per light fixture."  (*Id.* at 26.)  Target claims to have purchased ████ fixtures at the $██ price and thus claims damages of $1,625.438.70 and a supposed right to compensation for attorneys' fees.  (*Id.* at 26-27.)  BusSTRUT now moves for summary judgment to dismiss Target's ill-founded counterclaim.

## STANDARD OF REVIEW

A motion for summary judgment should be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *e.g.*, *Soo Line R.R. Co. v. Werner Enters.*, 8 F.Supp.3d 1130, 1139 (D. Minn. 2014) (Doty, J.).  A "material" fact is one that may affect the outcome of the suit under governing law.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  A "genuine" issue exists where there is sufficient evidence that a reasonable jury could return a verdict for either party.  *See id.*  Mere arguments or allegations are insufficient to defeat a properly supported motion for summary judgment; the nonmovant must present more than a scintilla of evidence and must advance specific facts to create a genuine issue of material fact for trial.  *See* Fed.R.Civ.P. 56(e); *Anderson,* 477 U.S. at 248-51.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary

judgment should be entered in the movant's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

Here, the record conclusively shows that busSTRUT did not breach the parties' contract but, to the contrary, at all times acted in compliance with the same. Further, Target repeatedly and explicitly approved the pricing about which it now complains. Thus, summary judgment in busSTRUT's favor is appropriate.

## **ARGUMENT**

### I.   THE PARTIES' WRITTEN AGREEMENT ALLOWED BUSSTRUT TO CHARGE THE $▮ EXPEDITED PRICE.

Target's breach-of-contract claim fails as a matter of law because the $▮ expedited price was included in and allowed by the parties' written agreement. Paragraph 1.1 of the SQA makes clear that the "



" (Ex. 4, SQA, at ¶ 1.1 (emphasis added).) *See also id.* ¶ 24 (the "

(emphasis added)).) Thus, pursuant to the plain language of the SQA, all orders placed by Target are part of the parties' written contractual agreement. And Target's orders unambiguously reflect the $▮ expedited price that busSTRUT charged.

As summarized in the fact section above, every single expedited fixture busSTRUT shipped to Target was shipped to fulfill an order placed by Target. Every Target order, in

turn, included explicit approval of the cost that busSTRUT quoted to Target.   And busSTRUT's quotes priced the expedited fixture at $██ per unit.   In other words, every $██ fixture sold to Target was sold pursuant to a Target purchase order approving that cost.   Those orders are, by the plain terms of the SQA, part of the parties' written agreement.   Accordingly, the parties' written agreement itself explicitly and repeatedly provides for an expedited-fixture cost of $██.   *See Bib Audio-Video Prods. v. Herold Mktg. Assocs.*, 517 N.W.2d 68, 71 (Minn. Ct. App. 1994) ("The final expression of an agreement's terms can be embodied in a purchase order." (citing *Action Time Carpets v. Midwest Carpet Brokers,* 271 N.W.2d 36, 39 (Minn. 1978)).   The fact that the parties agreed to the $██ expedited price *in the very contract Target claims was breached* is by itself reason enough to dispose of Target's counterclaim on summary judgment.

## II. THE PARTIES' COURSE OF PERFORMANCE CONFIRMS THAT BUSSTRUT DID NOT BREACH THE AGREEMENT.

Although the parties' written agreement (including Target's purchase orders) should be dispositive, the parties' course of performance provides an additional, independent basis for granting busSTRUT summary judgment on Target's counterclaim.   That course of performance conclusively shows that the $██ expedited-fixture price is consonant with the written agreement and was agreed to by the parties.   The Amendment does not preclude, or otherwise address, expedited pricing; busSTRUT was forthright with Target in its pricing of expedited fixtures; Target repeatedly approved price lists including the expedited fixture; and Target consistently issued orders purchasing the fixture at the $██ expedited price.   In other words, the parties' course of performance confirms that *both* parties

understood that the $█ expedited-fixture cost was a proper component of their overall agreement.

### A. The Uniform Commercial Code Provides that Course of Performance is Relevant to Interpreting Commercial Contracts.

The Uniform Commercial Code is clear: "A course of performance…is relevant in ascertaining the meaning of the parties' agreement, may give particular meaning to specific terms of the agreement, and may supplement or qualify the terms of the agreement." Minn. Stat. §336.1-303(d). Indeed, "'the course of actual performance by the parties is considered the best indication of what they intended the writing to mean.'" *Minnesota v. CMI of Ky., Inc.*, No. 08-603, 2009 WL 2170134, at *5 (D. Minn. July 16, 2009) (quoting Minn. Stat. § 336.2-202 cmt. 2). "[T]he express terms of an agreement and any applicable course of performance…must be construed whenever reasonable as consistent with each other." Minn. Stat. §336.1-303(e).

Particularly relevant here, the UCC also directs that course of performance "may supplement" the terms of an agreement. Minn. Stat. §336.1-303(d); *see also id.* § 336.2-202 (even "[t]erms…set forth in a writing intended by the parties as a final expression of their agreement…may be explained *or supplemented*…by course of performance" (emphasis added)). Indeed, the parties' "conduct during the course of performance" of a written contract is properly relied upon to fill "gaps or omissions in the contract." *J.J. Brooksbank Co. v. Budget Rent-A-Car Corp.*, 337 N.W.2d 372, 376 (Minn. 1983) (citation and internal quotation marks omitted).

**B.    The Parties' Course of Performance Establishes their Agreement to a $█████ Expedited Price.**

To be clear, the Court need not do any gap-filling here because Target's orders, which include the $███ expedited price, are part of the parties' agreement.  The Court can simply enforce the agreement (of which the orders are a part) as written.  But if the Court does choose to look beyond the agreement itself, the parties' course of dealing confirms busSTRUT's interpretation of the agreement and confirms the propriety of summary judgment in busSTRUT's favor here.

The parties' agreement—specifically, the Amendment—requires Target to provide 12 weeks' notice for its orders (Ex. 8, ¶1.1) and specifies that, under such circumstances, busSTRUT will sell the fixtures to Target at $█████ apiece.  (*Id.* ¶1.3.)  But the Amendment does *not* specify what price will apply in the event that Target orders fixtures to be delivered on less than the required 12 weeks' notice, though it implies, by its silence, that alternative pricing will be charged for these expedited orders.  (*See id.* ¶¶1.1, 1.3.)  Indeed, if there were no additional charge to Target for failing to comply with the 12-weeks'-notice provision, that provision would be rendered superfluous and of no effect, contrary to basic principles of contract interpretation.  *See, e.g., Chergosky v. Crosstown Bell, Inc.*, 463 N.W.2d 522, 526 (Minn. 1990) (courts must "attempt to avoid an interpretation of [a] contract that would render a provision meaningless"); *Prudential Ins. Co. of Am. v. Sandvold*, No. 12-CV-132, 2012 WL 245161, at *3 (D. Minn. Jan. 25, 2012) (Doty, J.) ("The court interprets contracts to avoid absurd results and to give meaning to all provisions of a contract.").  In short, the Amendment allows alternative pricing for

expedited orders, but does not identify the price for such orders. (*Cf.* Ex. 1, Graham Dep., at 127 ("Q. ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████").)

This is precisely the type of situation in which course of performance can be not only informative, but *dispositive*.

Here, that course of performance unequivocally establishes the parties' agreement to a $██ price for expedited fixtures. From execution of the Amendment in November 2016 forward, every relevant action and inaction by the parties in the course of their performance shows that they had contracted for Target to pay the $██ price for expedited fixtures whenever Target failed to comply with the Amendment's requirement of 12 weeks' notice.

Indeed, Target agreed to the $██ expedited price immediately after executing the Amendment. One business day after the Amendment was signed, Gellert emailed Target stressing the importance of complying with the 12-weeks'-notice requirement. Three days after that, busSTRUT sent its first store quote under the parties' new agreement to Target. That quote included the $██ expedited-fixture price, and Gellert highlighted the $██ expedited price point in the body of the email to which the quote was attached. Target never objected and, to the contrary, promptly issued a purchase order incorporating busSTRUT's expedited pricing and subsequently paid for the order in full. (*See supra*, Fact Section B.)

For the next *16 months*, the quotes sent by busSTRUT (Target never once complied with the 12-weeks'-notice provision, after all) included the $██ expedited-fixture price.

And busSTRUT consistently made clear that failure to comply with the 12-weeks requirement was the reason for this pricing.   Each time busSTRUT sent a quote incorporating the $██ expedited-fixture price, Target issued a purchase order incorporating that pricing and, then, ultimately paid that price.  (*See supra*, Fact Section D; *see also Cent. Valley Ag Coop. v. Leonard*, 986 F.3d 1082, 1088 (8th Cir. 2021) ("course of performance between the parties" supported levying of 12.5% fee not provided for in written contract where the payor "repeatedly made payments of 12.5%...during the [contract] year").)

And that's not all.  The Amendment ████████████████████████████ ███████████████████████████████.  At Target's request, busSTRUT twice uploaded a master "catalog" (price list) to Ariba that plainly listed the expedited light fixture as available for the price of $██ per unit.  And Target affirmatively approved this price list in both December 2016 and July 2017.  (*See supra*, Fact Section C.)

Thus, as the undisputed evidence establishes, busSTRUT repeatedly made clear that it was charging $██ for expedited light fixtures, and Target repeatedly approved that pricing, voluntarily incorporated it into its own orders, and systematically paid the $██ expedited-fixture cost as contractually required.  Target only took exception to this pricing in March 2018—after Target had already agreed to and paid this pricing for 16 months. *Cf. Alpena Portland Cement Co. v. Backus*, 156 F. 944, 947 (8th Cir. 1907) (interpreting contract to require 30 days' advance notice of shipments where cement company had maintained that position since entering contract in December "and it was not until [the following] September that [the company's contractual counterpart] took exception to it").

And even that attempt to unilaterally change the terms of the parties' agreement was short lived and ultimately provides further confirmation that the $█ expedited-fixture price was agreed to and proper. After Target tried to order fixtures in March 2018 for $█ apiece despite having failed to comply with the 12-weeks'-notice requirement in the Amendment, busSTRUT responded by explaining why the $█ expedited price was the correct one. Target then paid the $█ expedited price, not only on that order, but on all remaining orders. (*See supra*, Fact Section E.) Here too, then, Target's conduct once again confirmed the parties' agreement on the $█ price for orders that did not meet the 12-week lead-time requirement of the Amendment.

## C. Courts Find Evidence of Course of Performance Dispositive in Far Less Compelling Circumstances

Courts have relied upon far less compelling course-of-performance evidence to interpret or supplement a contract. *Oskey Gasoline & Oil Co. v. OKC Refinery, Inc.*, 364 F. Supp. 1137, 1139 (D. Minn. 1973), for example, involved a dispute over gasoline deliveries made by a refinery to a gasoline distributor. The parties' written contract, drafted by the refinery, was for the purchase and sale of 15,000 barrels—630,000 gallons—of gasoline per month. *Id.* at 1140. But the contract did not specify whether the gasoline would be measured in gross or net gallons.[8] *Id.* The distributor executed the contract but added an additional phrase specifying that the gasoline would be measured in gross gallons.

---

[8] Gasoline expands and contracts significantly with temperature changes. Measurement in net gallons offsets volume fluctuations caused by temperature. *Id.* at 1140. Measurement in gross gallons does not. *Id.*

*Id.* The refinery never formally agreed to this addition and proceeded to bill the distributor in net gallons. *Id.* But the distributor remitted payment in gross gallons instead. *Id.*

After the agreement was executed, the refinery never met its 15,000-barrels requirement in any month. *Id.* Then, five months into the contract, it stopped delivering gasoline to the distributor altogether. *Id.* The distributor sued for breach of contract, and the refinery countered that the *distributor* had breached by failing to pay in net, rather than gross, gallons. *Id.*

This Court rejected the refinery's argument based on the parties' course of performance. It noted that the agreement failed to specify (prior to the distributor's attempted modification) whether measurement in gross—or, instead, net—gallons was intended and held that in such circumstances it was proper to turn to the parties' course of performance to "defin[e] [the] contract terms." *Id.* at 1141. The Court noted that the refinery failed to object to payment in gross gallons until "five months after the contract commenced" and "after…[the refinery] had sold over two millions gallons of product" and "a national shortage of petroleum [had] beg[u]n." *Id.* at 1142. The course of performance—particularly, the refinery's five months of acquiescence to payment in gross gallons—showed that proper payment under the contract was indeed in gross gallons. *Id.* at 1142-43, 1145.

Just as the distributor in *Oskey* communicated its understanding that gross gallons were the proper measure, busSTRUT clearly communicated its view to Target that expedited pricing of $██ per fixture was proper. Just as the distributor in *Oskey* consistently paid on a gross-gallons basis, busSTRUT consistently billed Target $██ per

expedited fixture.  Just as the refinery in *Oskey* raised its net-gallons argument in an attempt to distract from its own breach, Target brings its counterclaim here in an attempt to distract from its egregious breach of the parties' contract.  And just as the Court in *Oskey* concluded that the gross gallons term was a proper part of the parties' agreement, so this Court should conclude here that the $█ expedited-fixture price was a bona fide term of the agreement between busSTRUT and Target.

Indeed, the course-of-performance facts are far *stronger* for busSTRUT here than were the course-of-performance facts for the distributor in *Oskey*.  Whereas the *Oskey* plaintiff paid in gross gallons for five months before the defendant complained, here busSTRUT charged $█ per expedited fixture for over *16 months* before Target made a peep.  Further, in contrast to the *Oskey* defendant's practice of billing in net gallons but accepting payment in gross, here not only did busSTRUT bill at the $█ expedited rate, but Target affirmatively paid that rate as well.  In other words, here *both* parties' routine practice with respect to the quote/purchase-order process confirms the propriety of the $█ price.  Moreover, unlike in *Oskey*, here Target affirmatively and repeatedly approved the catalog price list that include the $█ expedited fixture.  In short, the dispositive course-of-performance evidence in *Oskey* pales in comparison with the undisputed facts of this case.

The Minnesota Court of Appeals decision in *Glacial Plains Cooperative v. Chippewa Valley Ethanol*, No. A10-869, 2011 WL 382710 (Feb. 8, 2011), is also squarely on point.  There, the parties entered into an agreement by which plaintiff Glacial Plains agreed to supply defendant Chippewa with corn sufficient to keep its ethanol plant running

at full capacity.  *Id.* at *1.  Chippewa, in turn, agreed to make Glacial Plains its exclusive supplier of corn and to pay a set handling fee per bushel.  *Id.*  The contract also provided that Chippewa would pay corn storage fees to Glacial Plains whenever the plant "fail[ed] to process corn for a ten (10) day period."  *Id.*

The parties amended their agreement in writing several times.  *Id.* at *1-2.  When Chippewa expanded its plant, Glacial Plains expanded its corn-storage facilities to keep up with Chippewa's demand.  *Id.* at *1.  After years of performance, the parties' relationship broke down and they ended up in court.

One issue in the case was whether Chippewa was, in addition to the per-bushel handling fee—and separate and apart from the 10-day-closure storage fee explicitly provided for in the written agreement—also required to pay Glacial Plains a storage fee for any corn in excess of 180,000 bushels that Glacial Plains stored for Chippewa (the "surplus storage fee").  *Id.* at *2.  The trial court held that Chippewa was *not* required to pay such a fee.  *Id.*  Among other things, it found that the parties' agreement was "fully integrated" and that the fact that Chippewa "had paid [the surplus storage fee] as invoiced 'for some period' after the plant began operations."  *Id.* at *3.  But, the trial court said, "the gratuitous payment of storage fees without a…duty to pay noted in any written agreement is nevertheless inadequate to allow the Court to read such an obligation into the written contract."  *Id.* at *4.

The Minnesota Court of Appeals reversed.  All told, the parties' agreement had been in place from 1994 through September 2009.  *Id.* at *1, 6.  Only for three years—from 2003 to 2006—did the agreement and the amendments operative at the time expressly provide

for payment of a surplus storage fee. *Id.* at *2. Nevertheless, the court of appeals concluded that Glacial Plains was entitled to the surplus storage fee for the entire time period in dispute. *Id.* at *6. The court of appeals looked to the parties' course of performance in order to fill in this gap, even though the contract was "fully integrated," noting that the parol evidence rule did not pose an obstacle given that the rule "does not exclude evidence of subsequent…modification[] of a written contract." *Id.* at *4.

As to that course of performance, the court of appeals noted that Chippewa had paid the surplus storage fee "invoiced by Glacial Plains from January [through] June 1997;" that "Glacial Plains billed [Chippewa] for storage in excess of 180,000 bushels in December 2002;" and that Chippewa subsequently "paid storage costs as invoiced by Glacial Plains until November 2008." *Id.* at *5. Further, a former Chippewa manager conceded that, in a September 2008 letter, he had agreed that Glacial Plains would provide storage to Chippewa in excess of 180,000 bushels at the market rate. *Id.* Thus, the court of appeals said, "the parties' course of performance relating to the 1994 contract conclusively shows that the parties intended [Chippewa] to pay storage costs to Glacial Plains on grain stored over 180,000 bushels" through the course of the parties' relationship. *Id.*

The similarities between *Glacial Plains* and this case are striking. First, both this case and *Glacial Plains* stem from underlying requirements contracts. Second, both cases involve suppliers making extraordinary efforts to meet a purchaser's supply needs (Glacial Plains's construction of new grain-storage facilities and busSTRUT's maintenance of several million dollars in extra inventory). Third, both cases center on purchasers' obligations to compensate suppliers for extra services (expedited delivery of fixtures in the

case of busSTRUT, surplus storage in the case of Glacial Plains).  Just as the Minnesota Court of Appeals held that the purchaser in *Glacial Plains* was required under Minnesota law to pay the surplus storage fee, so too should this Court conclude that the expedite fee charged by busSTRUT, and repeatedly agreed to by Target, was proper as a matter of law.

As with *Oskey*, perhaps the biggest *difference* between *Glacial Plains* and this case is that the course-of-performance evidence in busSTRUT's favor is even more robust than was the course-of-performance evidence in *Glacial Plains*.  In *Glacial Plains*, the court cited the past-payment evidence noted above but also observed that Glacial Plains was unable to produce *any* evidence of surplus-storage-fee payment for a portion of the contract period spanning *more than five years*.  *Id.* at *5.  By contrast, here Target voluntarily paid the expedited-fixture cost throughout the entire time period at issue.  Further, whereas Glacial Plains produced evidence of a single letter memorializing the surplus-storage-fee term of the parties' agreement, here *scores* of purchase orders and two Target-approved catalogs provide written proof of the expedited-fixture price.

Applying *Oskey* and *Glacial Plains* to the facts of this case confirms what the parties' written agreement and course of performance here already make clear: busSTRUT was allowed to charge Target $███ for expedited fixtures.  Target's counterclaim, alleging that this charge breached the parties' agreement, fails as a matter of law and undisputed fact.

## **CONCLUSION**

For all of these reasons, busSTRUT respectfully asks this Court to grant summary judgment in its favor on Target's legally and factually deficient counterclaim.

Dated:  April 22, 2021

**ANTHONY OSTLUND
BAER & LOUWAGIE P.A.**


 *s/ Arthur G. Boylan*

Arthur G. Boylan (#338229)
Philip J. Kaplan (#389351)
3600 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55402
Telephone:  (612) 349-6969
aboylan@anthonyostlund.com
pkaplan@anthonyostlund.com

and

**ROBINSON LAW FIRM LLC**

Emmett E. Robinson (Ohio Bar No. 88537,
*pro hac vice pending*)
6600 Lorain Avenue, #731
Cleveland, OH  44102
Telephone:  (216) 505-6900
Facsimile:  (216) 649-0508
erobinson@robinsonlegal.org

**ATTORNEYS FOR PLAINTIFF**