# Exhibit 33 to the Second Declaration of Emmett E. Robinson

# (FILED UNDER SEAL)

Kalen A. Graham - March 11, 2020

---

**Page 1**

```
 1              SUPERIOR COURT OF CALIFORNIA
 2                   COUNTY OF ORANGE
 3  INTENSE LIGHTING, LLC, a
    California limited liability company,
 4
              Plaintiff,
 5
    vs.            CASE NO: 30-2018-00995279-CU-BC-JCJ
 6
    ARCHITECTURAL BUSSTRUT CORPORATION,
 7  a Delaware Corporation; and
    DOES 1 through 20, inclusive,
 8
              Defendants.
 9
    and
10
    ARCHITECTURAL BUSSTRUT CORPORATION,
11  a Delaware Corporation,
12            Cross-Complainant,
    vs.
13
    LEVITON MANUFACTURING CO., INC.;
14  CONSERVATION TECHNOLOGY OF ILLINOIS, LLC,
    d/b/a and a/k/a CONTECH LIGHTING;
15  INTENSE LIGHTING, LLC; and
    DOES 1 through 20, inclusive,
16
              Cross-Defendants.
17  _____
18
19
20           VIDEOTAPED DEPOSITION OF
21                KALEN A. GRAHAM,
22            Taken March 11, 2020
23           Commencing at 10:05 a.m.
24
25
```

**Page 2**

```
 1        Videotaped oral deposition of KALEN A. GRAHAM,
 2  taken March 11, 2020, commencing at 10:05 a.m., at the
 3  offices of Winthrop & Weinstine, P.A., Capella Tower,
 4  225 South 6th Street, Suite 3500, Minneapolis, Minnesota,
 5  before Dawn Workman Bounds, Certified Shorthand Reporter
 6  and Notary Public of and for the State of Minnesota.
```

**Page 3**

```
 1                 A P P E A R A N C E S
 2  ON BEHALF OF ARCHITECTURAL BUSSTRUT CORPORATION:
 3  Michael Kalis, Esq.
    LYNN PINKER COX & HURST, LLP
 4  2100 Ross Avenue, Suite 2700
    Dallas, Texas 75201
 5  214.981.3800
    mkalis@lynnllp.com
 6
 7  ON BEHALF OF LEVITON MANUFACTURING CO., INC.;
    CONSERVATION TECHNOLOGY OF ILLINOIS, LLC,
 8  d/b/a and a/k/a CONTECH LIGHTING; INTENSE LIGHTING, LLC:
 9  Joshua Kipnees, Esq.
    PATTERSON BELKNAP WEBB & TYLER, LLP
10  1133 Avenue of the Americas
    New York NY 10036
11  212.336.2000
    jkipnees@pbwt.com
12
13  ON BEHALF OF TARGET CORPORATION AND THE WITNESS:
14  Matthew R. McBride, Esq.
    WINTHROP & WEINSTINE, P.A.
15  Capella Tower
    225 South 6th Street
16  Minneapolis, Minnesota 55402
    612.604.6400
17  mmcbride@winthrop.com
18
    ALSO PRESENT:
19
    Greg Gellert
20  Larry Gellert
    Jacob Arvold - Videographer
21
22
23
24
25
```

**Page 4**

```
 1              I N D E X
 2  WITNESS: KALEN A. GRAHAM            PAGE
 3  EXAMINATION BY MR. KALIS..........     8
 4  EXAMINATION BY MR. KIPNEES........   178
 5  EXAMINATION BY MR. KALIS..........   247
 6  EXAMINATION BY MR. KIPNEES........   257
 7  EXAMINATION BY MR. KALIS..........   257
 8  MEDIA 1...........................     7
    MEDIA 2...........................    95
 9  MEDIA 3...........................   178
10  EXHIBITS MARKED/REFERRED TO
11  No. 129:  Graham LinkedIn Profile.........    10
12  No. 130:  9/9/16 Gellert e-mail to Graham
          Highly Confidential, Bates BCA-0106420-24.........   21
13
    No. 131:  9/19/16, Graham e-mail to Nickos
14  Confidential, Bates BCA-0058394...................   28
15  No. 132:  Target's SAP Sourcing eSourcing
          Invitation to Participate, Confidential
16  Bates BCA-0088485-88..............................   37
17  No. 133:  Target LED Heavy Duty Track Light Fixture
          Specifications, Confidential, Bates INT00064913....   44
18
    No. 134:  Target Property Development Pyramid
19  Organizational Name Date Stage....................   59
20  No. 135:  9/14/16 Emmer e-mail to Graham
          Confidential, Bates TAR-CASUBP000827...............   67
21
    No. 136:  11/2/16 Gellert e-mail to Graham
22  Confidential, Bates BCA-0063129-30.................   71
23  No. 137:  11/8/16 Graham e-mail to Trankel with
          attached Busstrut:  Lighting Price Discussion
24  November 3, 2016, Confidential, Bates TAR006568-75.   76
25
```

**17**

1  Q.  -- in engineering?
2  A.  Yeah.
3  Q.  Okay.  And who would those people be?
4  A.  Tom Monahan.
5  Q.  Okay.
6      Who is Tom Monahan?
7  A.  He works for Doyle.
8  Q.  So he's -- he reports to Doyle?
9  A.  Correct.
10 Q.  Okay.  And is all of this in the say 2016 to
11 2020 time frame?
12 A.  Yes.
13 Q.  Okay.  What was -- or what is -- during that
14 time frame, do you know what Doyle Trankel's title was?
15 A.  Director.
16 Q.  Okay.  And what about Tom Monahan?
17 A.  I don't know his title.
18 Q.  Okay.  All right.  And I see that it looks like
19 prior to Target you did some commercial real estate; is
20 that right?
21 A.  Correct.
22 Q.  And was that right out of college?
23 A.  Yes.
24 Q.  Okay.  And you went to St. Cloud State
25 University?

**18**

1  A.  Yes.
2  Q.  You graduated from there?
3  A.  Yes.
4  Q.  Okay.  Was your degree a BS, finance
5  management?
6  A.  Yes.
7  Q.  Okay.  Do you have any graduate degrees?
8  A.  No.
9  Q.  Okay.  And do you -- do you have any sort of
10 professional licenses?
11 A.  No.
12 Q.  Okay.  Do you have any electrical engineering
13 background?
14 A.  No, none.
15 Q.  Okay.  So I want to talk a little bit about
16 what Target does when it's considering working with a
17 supplier.
18      Is there some sort of prequalification
19 process that Target requires a potential supplier to go
20 through?
21 A.  Yes.
22 Q.  Okay.  And what is that prequalification
23 process?
24 A.  Be signing our master agreement, which is a
25 supplier qualification agreement in this case, signing

**19**

1  terms on Partners Online, and then setting up procurement
2  through Ariba.  I think how it's stated in the contract
3  is an electrical payment process.
4  Q.  So you said there are terms, Partners Online?
5  A.  Correct.
6  Q.  What is that?
7  A.  It's our vendor portal.  It's a broad vendor
8  portal.
9  Q.  And so there are -- there are documents or some
10 sort of application process that a potential supplier
11 goes into and fills out, or what is that?
12 A.  I don't have direct knowledge of how the -- all
13 the steps in Partners Online.  There's a contract support
14 team that manages that.
15 Q.  Would it be fair to say that this sort of
16 prequalification process isn't a negotiation --
17 A.  No.
18 Q.  -- process?
19     It's not fair to say that?
20 A.  It's -- it's not a negotiation process.
21 Q.  So I'm right; it's not a negotiation process?
22 A.  No.
23 Q.  I'm not right?
24 A.  It -- so it's -- it's -- the prequalification
25 isn't a negotiation.

**20**

1  Q.  It is just these are the forms you have to sign
2  if you want to --
3  A.  Correct.
4  Q.  -- end -- end up getting an agreement with us
5  or supplying us?
6  A.  Uh-huh.
7  Q.  "Us" being Target?
8  A.  If there was disagreement in redlines within
9  the supplier qualification agreement, we would -- we
10 would discuss those.
11     But when we set up an event and we're
12 vetting suppliers, we require that suppliers sign our
13 qualification agreement.
14 Q.  So what does "set up an event" mean?
15 A.  A sourcing event.
16     So at a high level, Target has a business
17 need --
18 Q.  Uh-huh.
19 A.  -- and we have a defined scope.
20     And we would work to set up an RFI,
21 request for information, or request for proposal with
22 suppliers that we know that supply products in the
23 category that we're interested in buying.
24     And through that event, we would validate
25 that suppliers have the product that we're looking for.

Kalen A. Graham - March 11, 2020

**61**

1    You can go ahead and answer.
2    A.  The contract is to secure pricing for a
3    three-year period of time.
4    Q.  (By Mr. Kalis) Okay. I want to make sure we're
5    not saying two different things.
6        So you're asking here, you -- Target is
7    asking here, what discount would you give to be awarded a
8    three-year contract instead of the standard two,
9    correct?
10   A.  Correct.
11   Q.  And so the idea being that a two-year contract
12   might have higher per yearly prices, but there might be a
13   discount associated with those yearly prices if the
14   contract was extended to three years, right?
15   A.  Yes.
16   Q.  And so don't you think that -- I mean, if -- if
17   Target only purchased materials -- if this -- if Target
18   only purchased materials from a supplier for one year,
19   but -- but they entered into a three-year contract with
20   reduced rates, I mean, don't you think it makes sense
21   that Target -- that the supplier would have expected to
22   be able to sell materials to Target over the course of
23   three years?
24       MR. McBRIDE:  Object to the form of the
25   question.

**62**

1        Go ahead and answer.
2    A.  I don't know how a supplier would interpret...
3    Q.  (By Mr. Kalis) Well, I mean, if Target
4    was going -- excuse me.
5        If a supplier was going to reduce its
6    yearly rate, it would make sense that it would want some
7    sort of assurance that Target would be buying over the
8    course of the three years, right; otherwise Target would
9    just be getting the benefit of a reduced rate for a
10   shorter term?
11       MR. McBRIDE:  Object to the form of the
12   question.
13       Go ahead and answer.
14   A.  Our contracts are put in place to have pricing
15   for a period of time. I can't speak to -- behind
16   specific supplier motivation of how they adjust their
17   price.
18   Q.  (By Mr. Kalis) Keep going.
19   A.  That -- that's my answer.
20   Q.  I'm just trying to work through like
21   practically how this --
22   A.  Yeah.
23   Q.  -- makes sense from like an economic
24   perspective.
25   A.  Yeah.

**63**

1    Q.  So like if a -- if a -- if I reduce my rate on
2    a yearly basis for an extra year of a contract, don't you
3    think that I would be expecting you to continue
4    purchasing from me over those three years?
5        MR. McBRIDE:  Objection, form of the
6    question.
7        You can go ahead and answer.
8    A.  I mean, I wouldn't -- I wouldn't state it that
9    way. I'd say --
10   Q.  (By Mr. Kalis) How would you state it?
11   A.  I would say that we'd have a contract in place
12   to purchase if we had a demand.
13   Q.  But there's no benefit to somebody who reduces
14   their yearly price for an extra year if Target only buys
15   from them for one year.
16       You would agree with that, right?
17       MR. McBRIDE:  Object to the form of the
18   question.
19       You can go ahead and answer.
20   A.  There's a lot of factors involved in that, so
21   no.
22       I mean, some vendors could look at a
23   three-year contract as risky because of commodity pricing
24   and steel and other factors.
25   Q.  (By Mr. Kalis) I'm just talking from like a

**64**

1    total cost perspective and what you're getting over three
2    years.
3        I mean, if a supplier knew that Target was
4    only going to buy from them for one year, they wouldn't
5    further discount that price, right?
6        MR. McBRIDE:  Object to the form of the
7    question.
8        You can go ahead and answer.
9    A.  Yeah, I don't know how a supplier would respond
10   to that.
11   Q.  (By Mr. Kalis) I'm not asking for a specific
12   response to a supplier.
13       You're asking -- Target is asking for
14   discounted pricing over a three-year term, correct?
15   A.  Yes. We would want to validate -- again, this
16   is an RFP, so we would want to validate and understand
17   how the suppliers see the market.
18       So we are simply asking, do you value a
19   two-year agreement or three-year agreement? And I think
20   if you'd state here in the response, that number's zero.
21   Q.  I'm not asking for what the response says.
22       I'm just asking about that question and
23   kind of thinking through the economics of a two-year
24   versus three-year contract. Right?
25       So if Target is entering a contract for

**81**

1  the Gellerts said to you about a two-year term versus a
2  three-year term.
3      A.  I mean, I would -- I would recall specific
4  things, yes.
5      Q.  Will you tell me what those specific things
6  are?
7      A.  Well, it'd be agreement to pricing,
8  nonfinancials.
9          Yeah, it's a very broad question, so it's
10  hard to just --
11      Q.  It's not a broad -- what I'm asking is do you
12  remember any specifics about what the Gellerts told you
13  during a conversation about a two-year term versus a
14  three-year term?
15      A.  I don't recall any specifics, no.
16      Q.  Okay.  Do you recall any specifics about what
17  you shared with them about a two-year term versus
18  three-year term?
19      A.  I mean, if you ask me a specific question, I
20  could answer; but I -- I couldn't state --
21      Q.  I don't know --
22      A.  -- specifics.
23      Q.  -- what -- I wasn't at that meeting, so I don't
24  know what was specifically said or not.
25      A.  Uh-huh.  Understood.

**82**

1      Q.  I'm trying to get from you whether you remember
2  any specifics from that conversation.
3          And I'm entitled to that information, and
4  I don't want to be surprised at trial with about what the
5  specifics were of a conversation.
6          So I'm asking you, please share with me if
7  you remember any specifics from that conversation.
8      A.  I can't recall specifics.
9          I mean, we discussed pricing.  We
10  discussed capability.  We discussed warranty.  Everything
11  that's on this document are topics that we discussed.
12      Q.  Okay.  So actually this document does pretty
13  closely reflect what was discussed at the meeting even
14  though you said previously it was an internal draft?
15      A.  So --
16      Q.  And actually --
17      A.  -- what you have in front of you is the
18  internal draft, yes.
19      Q.  But you --
20      A.  But what I had stated is parts of this -- and I
21  can't recall if this is the specific slide that we
22  presented at the time during the meeting, but it would be
23  of this similar structure.
24          This was our internal planning document.
25          But the topics that we discussed would be

**83**

1  regarding financial conditions and nonfinancial.
2      Q.  Who did the majority of the talking during this
3  November 10 meeting on Target's side?
4      A.  I mean, there was conversation from busSTRUT.
5  There's conversation from myself, my manager Dan Markus,
6  and Doyle Trankel.
7      Q.  So Dan Markus, you, and Doyle all contributed
8  during this meeting?
9      A.  I led the meeting and led the speaking points.
10  And then we would leave the room, and they would come
11  with a response --
12      Q.  And --
13      A.  -- to our presentation.
14      Q.  -- what was Doyle -- what was Doyle's role in
15  this meeting?
16      A.  He would be -- he's the business owner, and
17  ultimately his organization would sign the contract.
18      Q.  So again, I'm asking, do you remember any
19  specifics about what he contributed during this meeting?
20          And I don't want you to speculate.  I'm
21  just trying to actually get --
22      A.  Yeah.
23      Q.  -- an accurate --
24      A.  No, I can't -- no specifics, but it would have
25  been in line with the -- all of these points here.

**84**

1      Q.  But you don't remember specifics, is what
2  you're saying, without speculating?
3      A.  No.
4      Q.  Okay.  And does the same go for Dan Markus and
5  what his contributions were?
6      A.  Yes.
7      Q.  Now, busSTRUT did in fact win the heavy duty
8  track lighting program, correct?
9          MR. McBRIDE:  Object to the form of the
10  question.
11          You can go ahead and answer.
12      A.  We awarded a contract for pricing to purchase
13  their material, yes.
14          MR. KALIS:  Objection, nonresponsive.
15      Q.  (By Mr. Kalis)  There was an RFP for track
16  lighting.  BusSTRUT participated in the heavy duty track
17  category.
18          We've covered that, right?
19      A.  Uh-huh.
20      Q.  And that led to this November 10 meeting --
21  November 10, 2016, meeting, correct?
22          And -- is that correct?
23      A.  Correct.  Yeah.
24      Q.  And then the day after -- well, at the end of
25  that meeting, didn't you congratulate the Gellerts on

**89**

1  We'll get there, I promise you.
2       Right now I'm just asking about: You said
3  a recap of the agreement that was reached. And the recap
4  shows that Target was awarding Bussway an LED Head
5  Program for three years to busSTRUT, right?
6     A. That's what it states, yes.
7     Q. If it weren't true, you wouldn't have said
8  "agreed"?
9     A. And we wouldn't have entered a contractual
10 agreement with amendment number 2, so yes.
11      MR. KALIS: Objection, nonresponsive.
12    Q. (By Mr. Kalis) Not my question.
13      Again, we'll get there.
14    A. I got you.
15    Q. I promise, we'll get there.
16      But your recap would not have said that
17 the parties agreed to that if they actually hadn't agreed
18 to that?
19    A. My recap wouldn't state...
20      Can you restate the question?
21    Q. Yeah. Your recap that you sent -- here's the
22 recap of the agreement we reached.
23      You wouldn't have said, "agreed," next to
24 "award Bussway an LED Head Program for 3 years" if that
25 were not in fact what was agreed to, right?

**90**

1     A. It's a summary of our agreement, yes.
2     Q. Right. And I'm not trying to like --
3     A. Yeah.
4     Q. -- pin you down on like an agreement versus
5  this amendment.
6       I'm just trying to make sure that you
7  wouldn't have written that were it not true?
8       MR. McBRIDE: Objection, form of the
9  question.
10      You can go ahead and answer again.
11    Q. (By Mr. Kalis) I'm talking about the recap --
12 the summary that you sent...
13    A. I wouldn't have wrote it unless it was true.
14    Q. Would you have written "agreed" next to this if
15 Target had not actually agreed to that?
16    A. As it states, we agreed on these terms, yes.
17    Q. Okay. Now, this RFP process is not one where
18 there were multiple companies that were -- that were
19 selected or awarded business, right, for the heavy duty
20 track?
21    A. I mean, we selected suppliers for track
22 lighting in general.
23    Q. Not my question. I just want an answer to my
24 question.
25      The RFP process for the heavy duty track

**91**

1  that we've been talking about, right, that busSTRUT won,
2  right?
3       MR. McBRIDE: Object to the form of the
4  question.
5     A. Yeah, restate your question.
6     Q. (By Mr. Kalis) Yeah. I'm just talking about
7  this RFP for the heavy duty track that we've been talking
8  about. Okay?
9       That's where I'm starting. Are we good?
10    A. Yep.
11    Q. And Target entered into this agreement that we
12 have been talking about and that was later executed,
13 which we'll get to, based off of busSTRUT's submissions
14 in the RFP process, right?
15    A. We -- we -- yes, selected them to move on to
16 contracting, yes.
17    Q. Okay. And for the heavy duty track, you were
18 selecting busSTRUT and awarding it the Bussway and LED
19 Head Program for three years, not some other supplier,
20 right?
21    A. We selected busSTRUT, yes.
22    Q. So let's see if we can agree on this.
23      Leading up to this point, wouldn't you say
24 that everything that we've been talking about shows that
25 Target and busSTRUT were negotiating for Target to

**92**

1  exclusively purchase heavy duty track from busSTRUT?
2     A. No.
3       MR. KIPNEES: Objection to the form.
4     Q. (By Mr. Kalis) Okay. So we talked about
5  multiple companies or multiple suppliers competing in the
6  RFP process for heavy duty track, right?
7     A. We did.
8     Q. Okay. And we talked about how busSTRUT
9  ultimately won that RFP process.
10      As you can see in your recap here, they
11 were awarded the Bussway and LED Head Program for three
12 years, right?
13      What it says there, right?
14    A. Yes.
15    Q. Okay. And then busSTRUT ultimately agreed to
16 lower its prices for an extra three-year -- third term,
17 contract term, right?
18    A. I don't recall what motivated them to drop
19 their cost.
20    Q. I'm not asking about what motivated them.
21      I'm just saying it's a fact that the
22 agreement that was ultimately reached and signed was for
23 three years instead of two, right?
24    A. That's what the amendment states, yes.
25    Q. And then they actually, as part of that,

**93**

1  lowered their annual cost or price, right, for that third
2  term?
3      A. Again, I -- they lowered their price to enter
4  an agreement -- an amendment for the three years.
5          I don't know what motivated them...
6      Q. I'm not asking about their motiva --
7  motivations.
8          It's just a fact that Target asked, will
9  you lower prices for the -- for an extra contract term,
10 and that's what ended up happening, right?
11     A. Deal points aren't linear.
12         I mean, it would be an agreement of all of
13 the terms.
14         MR. KALIS: Not my question.
15         Objection, nonresponsive.
16     A. Okay.
17     Q. (By Mr. Kalis) There was this discussion about
18 will it be a two-year term or a three-year term. It
19 ultimately ended up being a three-year term.
20         I think we're in agreement on that,
21 right?
22     A. Uh-huh.
23     Q. Okay. And busSTRUT's price over three years
24 was less than its price was over two years, right?
25     A. I don't recall how they moved through our

**94**

1  discussions. I recall --
2      Q. So let me ask you this, then.
3          If we're able to show that its yearly
4  price was less over three years than two years, are you
5  going to dispute that?
6          MR. McBRIDE: Object to the form of the
7  question.
8          You can go ahead and answer.
9      A. I don't recall.
10     Q. (By Mr. Kalis) You don't have a way to dispute
11 that, really, is what you're saying?
12     A. Again, I don't know what --
13         MR. McBRIDE: Object to the --
14     A. -- what motivated --
15         MR. McBRIDE: -- form of the question.
16     A. -- them to make a decision.
17     Q. (By Mr. Kalis) I'm not asking about their
18 motivations.
19     A. Yeah.
20     Q. I'm just asking about on a per-year term.
21         For three years the per-year cost was less
22 than it was over two years, right?
23     A. Again, I don't -- I don't recall.
24         I recall what was written into the
25 contract.

**95**

1      Q. Okay. So you're not going to show up later and
2  try to argue otherwise because you don't recall, right?
3      A. No, I don't recall.
4      Q. Okay. Because if you recall, I'm entitled to
5  know that. I don't want to be surprised later.
6          So I'm just trying to get you to say
7  whether you know or not now.
8      A. Yeah, I don't.
9      Q. If you don't, that's fine.
10     A. I don't remember.
11     Q. Okay.
12         MR. KALIS: Is now a good breaking time?
13         THE VIDEOGRAPHER: This is good.
14         This is the end of media number 1 in the
15 deposition of Kalen Graham. We're off the record at
16 12:13 p.m.
17         (Recess 12:13-12:19.)
18         (Media 2.)
19         THE VIDEOGRAPHER: This is the beginning
20 of media number 2 in the deposition of Kalen Graham.
21         We're back on the record at 12:19.
22     Q. (By Mr. Kalis) Mr. Graham, tell me why you
23 don't think that the agreement with busSTRUT was
24 exclusive.
25     A. That word never came up in any discussions, and

**96**

1  there's nothing within our amendments that reflect
2  exclusivity. All the communications we sent around
3  quantities state "estimated."
4      Q. So if somebody at Target said Target negotiated
5  with busSTRUT to purchase thousands of feet of strut for
6  all of Target's stores, new and remodel, you're saying
7  you wouldn't agree with that?
8          MR. McBRIDE: Object to the form of the
9  question.
10         You can go ahead and answer.
11     A. They provided products for a subset of our
12 stores. "All" would be inaccurate.
13     Q. (By Mr. Kalis) Okay. And what are you basing
14 that on?
15     A. What am I basing that -- my answer on?
16     Q. Yeah.
17     A. Is that -- so we have different remodel
18 packages that we put into specific stores in different
19 markets. That would be, yeah, certain features or
20 products.
21     Q. Okay. So you're telling me if somebody at
22 Target said that busSTRUT and Target negotiated to
23 purchase -- for busSTRUT to purchase thousands of feet of
24 strut for all of Target's stores, new and remodeled, then
25 the person who said that is a liar?

Kalen A. Graham - March 11, 2020

### 205

1    Q. Okay. And Lux Beam is cheaper than busSTRUT's
2  system, correct?
3    A. Yes.
4    Q. Do you know by how much?
5    A. I don't, no. I don't have the figures in front
6  of me.
7    Q. But you know it was substantially cheaper,
8  correct?
9    A. Yeah, I can't -- I don't have -- I don't have
10 the information. I can't recall by how much.
11       But I do know we made the move because it
12 was a cost-effective move that would allow us to get in
13 line with our budgets.
14   Q. Okay. So other than the relationship with
15 Villa, the engineering recommendation, and that this was
16 a cost-effective move, do you recall any other factors or
17 information that was considered in deciding to consider
18 Lux Beam as an alternative to the busSTRUT system?
19   A. It would have been meeting the scope that
20 engineering required at that point in time.
21   Q. And do you recall what that scope was?
22   A. I do not, no.
23       The scope conversations at that point
24 were, you know, handled between Villa and the engineering
25 team.

### 206

1    Q. And just to be clear, the decision to consider
2  Lux Beam as an alternative to busSTRUT, that wasn't based
3  on a review of any sort of advertisement, was it?
4        MR. KALIS: Objection, form.
5    A. No, not that I know, no.
6    Q. (By Mr. Kipnees) Okay. It wasn't based on a
7  review of any sort of trade journal that talked about Lux
8  Beam?
9        MR. KALIS: Same objection.
10   A. I -- I don't know, no. I don't know.
11   Q. (By Mr. Kipnees) Okay. To your knowledge, no
12 one looked up the Contech website and looked up
13 information about Lux Beam in deciding to consider Lux
14 Beam as an alternative?
15   A. I don't know the actions of the engineering
16 team and their evaluation.
17   Q. Okay. But certainly you're not aware of any
18 advertisements that anyone in the engineering team
19 reviewed and decided to consider Lux Beam as an
20 alternative to busSTRUT's system, correct?
21   A. No advertise -- no.
22   Q. No, you don't know; or there are no
23 advertisement you're aware of?
24   A. I don't know. I'm not aware of any.
25   Q. And at what point in time did Target make a

### 207

1  final determination that it would be scaling down its
2  supply of busSTRUT and start using Lux Beam in parts of
3  the stores where busSTRUT's system had previously been
4  installed?
5    A. We -- we were -- we were reviewing contingency
6  plans. I said that the decision was engineering's
7  decision.
8        But the final determination occurred after
9  our second conversation with Greg and his father Larry
10 where we -- we opened up and -- to have a dialogue how to
11 move forward as an opening offer, I guess, which included
12 reducing the amount of locations that they would be in.
13       And during that meeting, you know, we
14 received I would say verbal assaults and swear words and
15 cussing and telling us we can't do that to them, and we'd
16 be speaking to their attorney.
17       So at that point in time, just based on
18 the friction on the call, I said, this is not a
19 productive conversation; and, you know, we'll -- we'll
20 end the call now.
21   Q. Okay. So I think this was a call that took
22 place on April 9, 2018.
23       Does that sound about right?
24   A. I mean, it was in the springtime frame. I
25 don't recall the dates.

### 208

1    Q. All right. Let me try to show you something
2  that I'm hoping will help jog your memory.
3        (Exhibit No. 150 marked.)
4        MR. KIPNEES: 150.
5        MR. KALIS: What is this? 150?
6        MR. KIPNEES: Yes.
7    Q. (By Mr. Kipnees) So Mr. Graham, this is Exhibit
8  150. It looks like it's an invite for a Skype meeting on
9  April 9, 2018.
10       Do you see that?
11   A. Yes.
12   Q. Okay. And it lists some of the items that
13 would be discussed on -- on that call. It says: Holding
14 this time for a conversation regarding PO history, design
15 changes, and future partnership.
16       And then it lists a number of other items
17 as well.
18       Target requests future orders, commit
19 process, and current inventory. Right?
20   A. Yes.
21   Q. Does this refresh your recollection of
22 whether -- the call that you just described where you and
23 others at Target were verbally assaulted, that it
24 occurred on April 9, 2018?
25       MR. KALIS: Objection, form.